HERBERT EMMER and CAROL EMMER, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Emmer v. Commissioner
Docket Nos. 6637-75, 6638-75, 6770-75, 4162-76.
United States Tax Court
T.C. Memo 1978-102; 1978 Tax Ct. Memo LEXIS 413; 37 T.C.M. (CCH) 460; T.C.M. (RIA) 780102; March 14, 1978, Filed Harry Janin and Alan R. Bialeck, for the petitioners in docket Nos. 6637-75 and 6638-75. Jerome Kamerman and David S. Zeidman, for the petitioners in docket Nos. 6770-75 and 4162-76. Michael P. Casterton, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket
Year No.
1970
1971
1972
1973
6637-75
$ 5,369.41
$ 11,346.35
$ 12,266.11
0
6638-75
10,733.13
7,064.89
2,991.69
0
6770-75
9,285.61
0
0
0
4162-76
0
2,231.18
2,166.25
$ 1,895.24
*416 Certain concessions having been made by the parties, the following issues remain for decision: 1. Whether certain payments made by petitioner 535 Display Company, Inc., formerly Display Designers and Producers, Inc. (hereinafter Display), to petitioner George Mayer (Mayer) in 1970, 1971, 1972, and 1973 were taxable to him as compensation for services or as capital gain. 2. Whether Display was entitled to business expense deductions for 1970, 1971, and 1972 for the payments made to Mayer. 3. Whether the payments made by Display to Mayer in 1970, 1971, and 1972 constituted constructive dividends to petitioner Herbert Emmer. 4. If Herbert Emmer received constructive dividends from Display, whether he is entitled to a deduction under section 483 [2] for imputed interest payments to Mayer. 5. Whether Mayer received ordinary income from Display in 1970 in the amount of $48,800. 6. Whether coverage and/or contributions under Display's pension trust plan were based on discriminatory classifications as proscribed by section *417 401(a)(3) and (4) so that a portion of its claimed deduction of $7,114 for contributions to the plan in 1970 should be disallowed. FINDINGS OF FACT 1. General
At the time their petition was filed, petitioners Herbert Emmer and Carol Emmer, husband and wife, were legal residents of Searingtown, New York. The Emmers filed their 1970 joint Federal income tax return with the Internal Revenue Service, New York, New York. Their 1971 and 1972 joint Federal income tax returns were filed with the Internal Revenue Service, Andover, Massachusetts. Petitioner Carol Emmer is a party herein only by reason of having filed a joint return with her husband, Herbert Emmer (hereinafter referred to as Emmer). Petitioners George Mayer and Phyllis Mayer, husband and wife, were legal residents of Forest Hills, New York, when their petition was filed. Their 1970 through 1973 joint Federal income tax returns (using a cash basis) were filed with the District Director of Internal Revenue, Brooklyn, New York. A 1970 amended joint Federal income tax return was filed on January 25, 1973, with the same office. Petitioner 535 Display Company, Inc. (Display), formerly Display Designers and Producers, *418 Inc., is a New York corporation. On or about December 3, 1975, Display made an assignment for the benefit of its creditors to Robert M. Fisher. At the time its petition was filed, Display's principal place of business was located in New York, New York. It maintained its books and records on the accrual method of accounting with a calendar year accounting period. Display's Federal income tax returns for 1970, 1971, and 1972 were filed with the Internal Revenue Service, Andover, Massachusetts. 2. Nature and Treatment of Display's Payments to Mayer
Prior to July 1, 1968, Mayer owned all of the capital stock of Display, a subchapter S corporation. Display was engaged in producing creative point-of-purchase advertising displays to promote its customers' products. Using wood, metal, and plastics, Display created a variety of fixtures, racks, and other items to command attention to, and help merchandise, products at the retail level. Prior to July 1, 1968, Mayer solicited orders for Display. Following acceptance of the proposed design, usually created by free-lance artists working on a commission basis, Mayer arranged for the manufacture and delivery of the displays to the *419 customers. Display did not do any of the actual manufacturing, but rather it used various suppliers and fabricators. Display's business was a service business in which it acted in effect as a broker. Although in a competitive business, Display did not advertise. Its principal customer was Pan American World Airways, Inc. (Pan Am), which accounted for 70 percent of Display's sales for the calendar year 1967 and 77 percent for the 6 months ended June 30, 1968. None of Display's customers were bound by long-term contracts which would require them to give Display any particular amount of business. Ordinarily, a customer would contact the various companies in the industry when it needed a point-of-purchase display. Once the customer selected the company, its order would specify a stated design and quantity at an agreed price. Because of the desired individuality of each display, it was impossible for Display to maintain a ready stock of designs for customers. Emmer was Pan Am's sales promotion manager and was responsible for the creative and artistic aspects of direct mail, literature, posters, and displays, and the budgeting and purchasing of materials. During 1967 and 1968 *420 Emmer gave Display a large part of Pan Am's business, in part because of his personal relationship with Mayer. However, considerations of design, price, and services often resulted in other companies getting Pan Am's business. Because of the competitiveness of the industry and Display's relatively small size, it was essential that Display protect its close relationship with Pan Am. Mayer was also the sole stockholder of Dynamic Advertising Company, Inc. (Dynamic) during 1968. Dynamic had only one client, American Sugar Company, to which it rendered art services. This client gave Dynamic only enough business to occupy Dynamic's sole employee, who had worked on the account for many years. Upon the death of this employee, shortly after June 30, 1968, American Sugar Company discontinued dealing with Dynamic. Until late 1967, Mayer, who was at that time approximately 60 years old, was in good health and acted as Display's principal executive. However, toward the end of that year, Mayer suffered a heart attack and remained away from work for a number of days. In the spring of 1968, Mayer approached Emmer and told him that he was in ill health, that he wanted to take it a little *421 easier, and that he would be able to do so if Emmer would leave his position at Pan Am and join Display. During this initial informal conversation, Mayer and Emmer discussed Display's business in general and the importance of Pan Am to Display's future. For financial reasons, Emmer, who was earning $18,000 a year at Pan Am and had a net worth of only approximately $25,000 to $30,000, was reluctant to consider the proposition. In addition, Emmer had had no experience in running his own company. However, Mayer eventually convinced him to give the matter serious consideration. Mayer thought that Emmer could take over the company, even though he had no experience in operating a business, because he was young enough and had the Pan Am account. In the course of their discussions, Mayer indicated that he would need $25,000 per year for 10 years if Emmer came with him. Emmer eventually agreed to join Display, and thereafter retained Steven J. Kumble (Kumble) as his attorney to work out an agreement with Mayer.
Mayer and Emmer met on several occasions with Kumble and Gerald Barandes (Barandes), counsel for Mayer and Display, to work out an agreement. On March 19, 1968, an initial *422 memorandum outlining the principal provisions of the proposed agreement was prepared by Kumble and forwarded to Barandes. This memorandum provided, interalia, for payments to Mayer of $17,500 per year for 10 years. Barandes increased this amount to $25,000 per year, and made other revisions.Eventually a final Purchase Agreement with draft collateral agreements was prepared and signed on May 25, 1968. The following is a summary of the pertinent provisions of the Purchase Agreement: 1. Mayer was to sell to Emmer, for a stated consideration of $10, 50 percent of Display's outstanding stock, together with an option to purchase the remaining 50 percent during the month of June 1970 at a price of $15.Closing of the initial sale was set for July 1, 1968. 2. Display's balance sheet, as of December 31, 1967, was attached to the Purchase Agreement and was represented by Mayer as accurately reflecting all tangible assets and liabilities. Mayer assumed responsibility for any undisclosed liabilities. It was agreed that no distributions would be made from the corporation to Mayer prior to closing, except that Mayer would be entitled to a distribution of profits for the 6 months *423 ended June 30, 1968. 3. Mayer agreed to liquidate and dissolve Dynamic and to arrange for Dynamic to sell all of its "business and good will," including its name, to Display for $10. 4. Mayer agreed to repay his indebtedness in the amount of $16,682.89 to Display and to make an additional capital contribution of $18,872. Thereafter, Display was to repay its indebtedness in the amount of $35,555.44 to Dynamic. 5. Mayer and Display were to enter into an Employment and Consulting Agreement (a draft of which was attached). 6. Emmer and Display were to enter into an Employment Agreement (a draft of which was attached.) Mayer agreed to personally guarantee Display's payment of Emmer's salary for the first year of Emmer's employment. Display's Employment and Consulting Agreement with Mayer (hereinafter sometimes referred to as the Employment Agreement), referred to in paragraph 5 of the foregoing summary, contained the following pertinent provisions: NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained and for past services rendered by the Employee [Mayer] to the corporation the parties hereto, intending to be bound, agree as follows: *424 1. The term of this agreement shall be for a period of twelve (12) years from the date hereto and terminating on July 1980. 2. The Employee is hereby hired and engaged as follows: (a) As President and the chief executive officer of the Employer [Display], for the first year of his employment herewith; (b) As Executive Vice President of the Employer for the second year of his employment hereunder; and (c) As a part time consultant to the Employer for the remaining ten years of his employment hereunder, and
(d) for past services rendered. 3. For his services as aforesaid, the Employee shall receive an annual salary of $25,000 payable in equal monthly installments on the first of each month for the first two (2) years of his employment hereunder and in consideration for past services rendered by the Employee the sum of $25,000 per year payable in equal monthly installments on the first of each month for the last 10 years hereof. * * *
5. In the event the Employee should die during the term of this Agreement, the Salary he was receiving immediately prior to his death shall be paid, for the balance of the term hereof, in annual installments, to *425 such person or persons and in such proportions as the Employee may have designated in writing to the Company from time to time, or, in the absence of such designation, as the Employee may have appointed by his Last Will and Testament, or if the Employee dies without having made such designation or appointment, to his estate. 6. (a) The Employee will not at any time in the future disclose to any person, firm or corporation any information regarding the business, or the present or former customers of the Employer; (b) Except in the employ of the Employer or its successors, the Employee will not at any time within one (1) year from the end of the term hereof, directly or indirectly, in any capacity whatsoever, * * * solicit for or supply the type of service now or at any time during the term hereof supplied to any of the customers of the Employer who are such customers as of the date hereof, who become customers during the term hereof, or who were such customers during the two (2) years immediately preceding the date hereof, nor will he attempt to do so, nor will he assist, finance, be interested in or connected in any capacity with any other person, firm or corporation, which shall *426 solicit or serve any of such present, future or former customers or attempt to do so, nor will he do anything to prejudice the business of the Employer or the good will thereof in any manner whatsoever. (c) * * * [The] Employee will not * * * engage in any phase of the present or future business of the Employer's business, serving customers anywhere within the geographic area in which the Employer shall conduct its business at any time during the term hereof. [Underscoring added.] The material underscored in the above-quoted provisions of the Employment Agreement was not included in the original draft but was added at the closing on July 1, 1968, at the suggestion of Mayer's attorney, Barandes. Barandes was concerned about the need for a recitation of consideration for the continuance of the annual payments even after Mayer's death, as provided in paragraph 5 of the Employment Agreement. He insisted on this language being added, even though Display did not then have an obligation to Mayer for past services rendered. The Purchase Agreement was closed on July 1, 1968, at which time the Employment Agreement and other related agreements were executed. The provisions of the *427 Purchase Agreement concerning the capital contributions by Mayer, the repayment of Display's obligation to Dynamic, and the liquidation of Dynamic and transfer of its goodwill to Display [3] were all carried out as agreed. Display's profit for the 6 months ended June 30, 1968, in the amount of $10,533.04 was distributed to Mayer, also as agreed.In 1970, Emmer exercised his option to purchase the balance of the Display shares from Mayer for $15. During the negotiating sessions leading to the final agreements there had been no discussion of payments specifically for Display's goodwill, for the value of work in process not reflected in Display's June 30, 1968, balance sheet, or for Mayer's covenant not to compete. Neither was there discussion of interest to Mayer on the $25,000-per-year payments. There was, however, discussion and agreement that Emmer would not be personally liable for the annual $25,000 payments to Mayer. The payments were to be Display's sole obligation. Also discussed was the critical factor of income tax deductibility by Display of the $25,000 yearly *428 payments made to Mayer for the last 10 years of his Employment and Consulting Agreement. During these discussions, Barandes and Mayer persuaded Kumble that the payments would be deductible if the Purchase Agreement and the Employment Agreement, as proposed, were the final contracts.However, there was no discussion, or requirement in the agreements, as to Mayer's reporting of the payments as ordinary income. Neither Mayer nor Barandes ever requested to reform the agreements so as to show the payments as consideration for Display's stock. During negotiations, Kumble was concerned about possible undisclosed liabilities of Display and wanted the parties to use a new corporation. Although he accepted Mayer's and Barandes' insistence on retaining Display, partially on Mayer's agreement to be responsible for undisclosed liabilities, he considered Display's stock as having no value, and thus, the Purchase Agreement provided only a nominal consideration for the stock. Display's balance sheet as of December 31, 1967, was as follows: ASSETS
Current Assets
Cash in Bank
$ 14,219.56
Accounts Receivable
71,749.51
Advances to Employee
350.00
$ 86,319.07
Loan Account - G. Mayer
41,825.16
Less: Profit per Exh. B applied
25,142.27
16,682.89
*429 Fixed Assets
Cost
Reserve
Book Value
Furniture & Fixt.
$ 11,101.60
$ 7,771.40
$ 3,330.20
Photo-Equipm't
3,754.71
3,754.71
0
Leaseh. Imprvts.
6,073.05
467.16
5,605.89
Studio
7,709.52
3,083.80
4,625.72
$ 28,638.88
$ 15,077.07
$ 13,561.81
13,561.81
Total Assets
$ 116,563.77
LIABILITIES
Current Liabilities
Accounts Payable & Expenses Accrued
$ 46,296.22
Loan Payable - Bank
8,000.00
Officer's Salary Accrued-G. Mayer
18,000.00
Taxes Accrued
5,712.11
$ 78,008.33
Loan due to Dynamic Advertising Corp.
35,555.44
Total Liabilities
$ 113,563.77
CAPITAL
Capital Stock
3,000.00
Undistributed Income (S Corp.) applied against
loan, see above
0
3,000.00
Total Liabilities & Capital
$ 116,563.77
Display's balance sheet as of June 30, 1968, was as follows: ASSETS
Current Assets
Cash in Bank
$ 3,128.13
Accounts Receivable
77,035.75
Advance to Ch. Algava
350.00
Due from Cornelius for June rent
100.00
$ 80,613.88 Fixed Assets
Cost
Reserve
Book Value
Furniture & Fixture
$ 11,591.50
$ 8,350.98
$ 3,240.52
Photo Equipment
3,754.71
3,754.71
0
Leaseh. Improvts.
4,773.27
1,568.64
3,204.63
Studio
7,709.52
3,459.28
4,250.24
1967 Cadillac
4,550.00
758.50
3,791.50
$ 32,379.00
$ 17,892.11
$ 14,486.89
14,486.89
Total Assets
$ 95,100.77
*430 LIABILITIES
Current Liabilities
Accounts Payable - Trade
$ 37,674.56
Loan Payable - Bank
20,000.00
Taxes Accrued
1,318.36
Expenses Accrued
10,011.42
Exchange Graphic Arts
730.48
69,734.82
Loan Account due to George Mayer
11,832.91
Total Liabilities
81,567.73
CAPITAL
Capital Stock
$ 3,000.00
Undistributed Profit
10,533.04
13,533.04
Total Liabilities & Capital
$ 95,100.77
With regard to the June 30, 1968, balance sheet, the 1967 Cadillac, listed as having a book value of $3,791.50, was used exclusively by Mayer, primarily for personal purposes. The studio shown on the balance sheet with a book value of $4,250.24 was in Mayer's home in Woodstock, New York. The leasehold improvements with a book value of $3,204.63 were with respect to rented premises at 1 East 42nd Street, New York, New York. The improvements included the plumbing, electrical work, and some wall paneling which had no realizable resale value. Display moved to 535 Madison Avenue about a year and a half later. The furniture and fixture account, which included desks, typewriters, chairs, etc., had a book value of $3,240.52. When Emmer first joined Display in 1968, *431 he knew nothing about the purchasing, pricing, estimating, and manufacturing end of the business. It, therefore, was important for him to have the guidance Mayer could give him. In the fall of 1970, a dispute arose between Mayer and Emmer as to the amount owed Display by Mayer for advances made to him. This dispute was settled by arbitration. In addition, Display demanded that Mayer return the Cadillac which was owned by Display but used by Mayer while he was a full-time employee. Mayer eventually paid Display $5,000 for the automoble. In part because of these differences, Emmer did not call upon Mayer for consulting or other assistance during the period subsequent to his full-time employment, even though the Employment Agreement provided for Mayer's part-time consulting services for a 10-year period. In his joint Federal income tax returns for the years 1970 through 1972, Emmer reported wages received from Display in the amount of $49,800, $40,000, and $41,000, respectively. He did not report any dividends from Display for those years.
The following amounts were shown on Mayer's joint Federal income tax returns as wages received from Display, and capital gains from the *432 sale of Display stock: Year
Wages
Capital Gains
1968
$ 51,683
$ 0
1969
26,500
0
1970 (Original)
23,800
12,500
1970 (Amended)
12,500
12,500
1971
0
25,000
1972
0
25,000
1973
0
25,000 Mayer attached to his original 1970 income tax return a corrected copy Form W-2 received from Display which showed $36,300 wages paid. In the early spring of 1974, Emmer learned that Mayer had been reporting the annual $25,000 payments from Display as capital gain from the sale of Display stock, and he therefore caused Display to stop making the payments. Emmer believed that if Mayer did not report the payments as ordinary income, Display could not take business expense deductions for them. The parties submitted this dispute to arbitration, and an award of arbitration in Mayer's favor was issued on September 15, 1975. Respondent determined that Mayer received ordinary income and not long-term capital gain of $12,500, $25,000, $25,000, and $25,000, as a result of the payments from Display for the taxable years 1970 through 1973, respectively. Respondent disallowed Display's deductions for the payments made to Mayer in 1970, 1971, and 1972 because of the *433 company's failure to establish that the payments were made for consulting services rendered to it. In addition, respondent determined that the Emmers received constructive dividends from Display due to the disallowance of Display's claimed business expense deductions with respect to the payments to Mayer. 3. 1970 Unreported Income of Mayer
In the fall of 1970, at Emmer's direction, Display initiated a lawsuit against Mayer. The complaint demanded repayment of advances Display had made to Mayer and the return of a 1970 Cadillac Mayer had kept when he terminated full-time employment with Display in June 1970. The amount of the advances was disputed. Emmer had asked Mayer to repay his loan balance prior to June 1970; however, at that time he did not give Mayer an exact figure as to how much was owed. Mayer, although aware that a loan account existed and that various personal expenses had been paid by Display and charged to this account, did not know what the account's balance was as of July 1, 1970. During the negotiations leading to the final settlement of the suit, Display's attorney argued that Mayer had a loan account balance on June 30, 1970, of $46,700. This *434 figure had been given him by Display's regular accounting firm. Mayer's attorney, on the other hand, disputed whether some of the items included in the $46,700 figure were Mayer's personal expenses. Mayer also alleged that he was entitled to certain offsets against the amounts advanced. The suit was settled on November 12, 1970, by Mayer's agreement to pay Display $20,000 "in full and complete satisfaction of all sums heretofore loaned or advanced." On October 30, 1970, Emmer, as Display's sole stockholder and director, called a special joint meeting of the stockholders and directors. The minutes of the meeting provide in part: * * * [The] settlement which would be made with Mr. Mayer would be a settlement of a $46,700 advance by this Corporation to Mr. Mayer by offsetting $23,800.00 owed by this Corporation to Mr. Mayer on account of unpaid bonus salary and further reducing the amount of $46,700.00 by $2,900.00 The Chairman stated that Mr. Mayer had agreed to pay the Corporation $20,000.00 in complete satisfaction of all sums loaned or advanced by the Corporation to Mr. Mayer. * * * In his original 1970 joint Federal income tax return, Mayer reported wages from Display *435 in the amount of $23,800 and a capital gain from the sale of Display stock in the amount of $12,500. Attached to the return was a corrected copy Form W-2 reflecting wages of $36,300. Subsequently, Mayer filed an amended 1970 return reflecting a capital gain of $12,500, but wages of only $12,500. Emmer was Display's executive vice president for the first half of 1969 and its president and chief executive officer thereafter. Display paid Emmer a $25,000 bonus in both 1969 and 1970. Schedule E of Display's 1970 tax return states that the amount of compensation for Mayer was $12,500. The return also shows that $12,500 of consulting fees were paid. There was no accrued salary or bonus account reflected on the yearend balance sheet included in the return. Respondent determined that Mayer's ordinary income for 1970 was $48,800, composed of a regular salary of $12,500, consulting fees of $12,500 (as discussed hereinabove), and a salary bonus of $23,800, which was the offset in the 1970 settlement. 4. Pension Plan Deduction
On November 1, 1970, Display adopted a Pension Plan & Trust Agreement which provided in pertinent part as follows: ARTICLE II PARTICIPATION
*436 2.1 Eligibility
All present and future full-time employees of the company who have attained age 25 but not 56 shall be eligible to participate in the plan on the effective date or anniversary date following the completion of 2 full years of service with the company. * * *
2.3 Termination
Upon the termination of a participant's employment with the Company, the funding of his pension hereunder shall cease and he shall be entitled only to those benefits provided under Article VI. If, at a later date such employee is re-employed by the Company, he will be treated as if he were a new employee, except that any benefits payable for periods after re-entry shall be reduced by the actuarial equivalent of any amounts previously vested in the participant. * * *
ARTICLE VI BENEFITS UPON TERMINATION OF EMPLOYMENT
6.1 Discharge for Cause
If a member's employment is terminated; because of proven dishonesty, proven fraud, proven larceny, proven embesslement [sic] or conviction of felony, he shall forfeit any and all interest in the plan. 6.2 Termination
If a participant shall for any reason other than cause, as defined in Section 6.1, death or retirement, *437 cease to be employed by Company, such terminated participant shall have no further rights or interest nor receive any benefits under the Trust except as provided in this Article VI. * * *
On November 1, 1970, Display had three employees: Emmer, Charles Algava (Algava), and Joyce Aronheim (Aronheim). Display filed an application (Form 4573) with the Internal Revenue Service for a determination that its plan qualified for tax exemption under section 401. Display disclosed that Emmer and Algava were covered by the plan and that it made contributions thereto in 1970 of $6,169.08 for Emmer and $945 for Algava. The application, although not referring to Aronheim by name, stated that Display's third employee was excluded from coverage for failure to meet the plan's minimum age requirements. If she had been covered, Display would have been required to make contributions of approximately $200. Emmer, who began employment with Display on July 1, 1968, was on November 1, 1970, serving as president and earning a salary of $50,000 per year. At that time he was 38 years old. On November 1, 1970, Algava was age 34 and had completed 10 years of service with Display. He was then earning *438 $12,740 per year. Algava's duties included estimating the cost of the design proposals and expediting their shipment. Aronheim, the ineligible employee, did secretarial-clerical work. At the time the plan was adopted, she was 23 years old and pregnant. Aronheim had worked with Display for over 3 years and was paid $7,760 per year. She terminated her employment with Display shortly after the plan's adoption. When Display adopted the plan, Emmer was aware that Aronheim was pregnant and would be leaving the company in a few months. Acting upon Display's application, the Internal Revenue Service determined that Display's plan failed to meet the requirements of section 401(a) for the taxable year ended December 31, 1970. The adverse determination letter read in part as follows: Coverage under your plan does not satisfy the percentage requirements of 401(a)(3)(A) of the Code, nor is it based on a nondiscriminatory classification within the meaning of 401(a)(3)(B), since the plan's participants earn more than the excluded employee. Thus, coverage discriminates in favor of the prohibited group, and the plan, standing alone, cannot qualify under Section 401(a)(3) of the Code's *439 Revenue Ruling 69-398 IRB 1969-29. In its income tax return for the year ended December 31, 1970, Display claimed a deduction of $7,114 for contributions to the pension plan. Respondent disallowed the deduction based upon his determination that Display's pension plan failed to meet the requirements of section 401(a). A copy of the determination letter, which refers to failures to satisfy section 401(a)(3), was attached to the statutory notice of deficiency. ULTIMATE FINDINGS OF FACT 1.The amounts paid by Display to Mayer pursuant to the Employment Agreement did not represent consideration for the transfer of his stock to Emmer. 2. The total income received by Mayer from Display in 1970 was $25,000. 3. Display's pension plan in 1970 was not discriminatory in favor of highly-compensated employees. OPINION 1. Nature and Treatment of Display's Payments to Mayer
Emmer and Display contend that the annual payments in question were compensation for services rendered by Mayer, as specified in the underlying documents. Mayer, on the other hand, argues that in substance the payments were consideration for the sale of his Display stock to Emmer. Respondent *440 has formally challenged both views in order to protect the revenue; however, on brief in these consolidated cases, he has adopted the argument of Emmer and Display that the payments to Mayer were ordinary income to him and deductible by Display. Payments made for consulting services rendered, of course, constitute ordinary income. Sec. 61. Likewise, the covenantor realizes ordinary income from payments received for his covenant not to compete. Ullman v. Commissioner, 264 F.2d 305, 307 (2d Cir. 1959), affg. 29 T.C. 129 (1957). Section 162(a)(1) allows a deduction for reasonable expenses if paid or incurred as compensation for personal services, including consulting services, actually rendered. In addition, a purchaser can amortize over the term of the covenant payments made for a noncompetition agreement. Sec. 167(a)(1); sec. 1.167(a)-3, Income Tax Regs.Levinson v. Commissioner, 45 T.C. 380, 389 (1966). On the other hand, payments which constitute a gain from the sale of property within the definition of capital asset in section 1221, such as stock, goodwill, going-concern value, or know-how, represent capital gain to the party *441 earning the income and nondeductible capital expenditures to the party making the payments. It is respondent's position that the Purchase Agreement and the Employment Agreement clearly provide that the annual payments which were to continue for 10 years, starting on July 1, 1970, pursuant to paragraph 3 of the Employment Agreement, and which in fact commenced on that date, were to be made for Mayer's consulting services. He argues that since the contractual allocations were clear on their face, Mayer must present "strong proof" to show that the parties' real intent and understanding underlying the agreements were otherwise. We agree with respondent that the annual payments in question were ordinary income to Mayer and deductible by Display. The major points of disagreement involve the interpretation of paragraphs 2 and 3 of Mayer's Employment Agreement and the conclusiveness of the stated consideration for Display's stock in paragraph 1 of the Purchase Agreement. Paragraphs 2 and 3 of the Employment Agreement are not entirely consistent because of the additions, suggested by Barandes and incorporated into the final agreement, relating to past services rendered.As adopted, paragraph *442 3 provides that Mayer would receive $25,000 per year for full-time employment during the first 2 years. The provision further provides that he would receive annual $25,000 payments for 10 years starting at termination of his full-time employment on June 30, 1970, in consideration for past services rendered. It does not specifically identify these annual payments following termination of full-time employment as compensation for services as a part-time consultant, even though paragraph 2(c) states that Mayer would be employed as such for these years. Thus, under a strict reading of the contract as written, the compensation for the period in question is paid only for past services rendered. Similarly, paragraph 1 of the Purchase Agreement, providing that 50 percent of Display's stock will be sold to Emmer for $10, with the remainder subject to an option allowing for later purchase at $15, is unambiguous on its face. Contracting parties are normally bound to the specific covenants and cost allocations thereto as expressed on the face of their agreements and the tax consequences flowing from them. The declarations in an agreement, clear on its face, can be avoided only where ( *443 Ullman v. Commissioner, 264 F.2d at 308)-- * * * strong proof * * * [is] adduced by * * * [a party to the agreement] in order to overcome * * * [the declared agreement]. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money. Although the Ullman case involved a factual situation where the questioned allocation was between a covenant not to compete and goodwill, the "strong proof" test enunciated therein is as well applicable to other situations where one party to an agreement questions the specific allocations of consideration made therein.See Estate of Rogers v. Commissioner, 445 F.2d 1020, 1021-1022 (2d Cir. 1971), affg. per curiam a Memorandum Opinion of this Court (determination of basis in a taxable exchange). [4]
*444 In light of the above, it was incumbent upon Mayer to show by "strong proof" that the specific allocation in his Employment Agreement of the annual payments to past services rendered did not express the intent of the parties or the value of the past services rendered. As established in our Findings of Fact, the concept of compensation for "past services" was belatedly introduced into the Employment Agreement as a rationale to establish consideration for any payments which may have been required subsequent to Mayer's death. The provision was added hurriedly at closing, as evidenced by the rough wording of the document, and without any apparent discussion, even though Display did not then have an existing obligation to pay Mayer for past services rendered. It is readily apparent that this allocation was not made to reflect the true intent of the parties as to the underlying purpose for the payments, nor did it express the true value of Mayer's past services rendered. Thus, we believe that Mayer has established by strong proof that none of the $25,000 annual payments was in reality compensation for past services. However, even if the "past services" language in the Employment Agreement *445 is ignored, the agreement as it stood prior to the addition of that language clearly provided that Mayer was to receive $25,000 annually as compensation for services to be rendered by him over a 12-year period. Thus, even though Mayer has established that the payments in question were not truly intended as compensation for past services, he must also establish that the original designation of the payments as compensation for current services was not the true nature of the arrangement--a far more difficult matter. In attacking the substance of the Employment Agreement, Mayer contends that the $25,000 annual payments were in reality payments for the purchase of his Display stock. He asserts that the total consideration of $25 for all of the stock, as provided in the Purchase Agreement, could not have represented its true value, and he has attempted to prove that the stock had substantial value, apart from the Employment Agreement and his covenant not to compete. Emmer's attorney, Kumble, testified that Display's stock had no value separate and apart from the employment and noncompetition arrangements with Mayer. Examination of Display's June 30, 1968, balance sheet appears *446 to substantiate Kumble's opinion. Although Display's capital stock and undistributed profits totaled $13,533.04, in accordance with provision 3(i) of the Purchase Agreement, the undistributed profit of $10,533.04 was to be distributed to Mayer. In addition, among the assets listed, the studio, with a book value of $4,250.24, and the 1967 Cadillac, with a book value of $3,791.50, although listed as corporation assets, were in reality under Mayer's exclusive control. The studio was in Mayer's home in Woodstock, New York, and was unavailable for general corporate use.The automobile was used exclusively by Mayer for mostly personal purposes. Display's purchase of Dynamic's business in accordance with provision 5(a)(i) of the Purchase Agreement added nothing to Display's tangible value, since all of Dynamic's assets, upon its liquidation went to Mayer (except for an inconsequential amount of photographic equipment purchased by Display). Mayer argues that Display's June 30, 1968, balance sheet does not reflect the corporation's entire net worth because Mayer was required by provision 5(a)(ii) of the Purchase Agreement to make a capital contribution of $18,872. However, the specific *447 purpose of this contribution was to retire a loan from Dynamic which was carried as a liability on Display's December 31, 1967, balance sheet, but which does not appear on the June 30, 1968, balance sheet. In the absence of evidence to the contrary, we conclude that the $18,872 capital contribution was already made by Mayer (and used to retire the liability to Display) prior to the June 30, 1968, balance sheet date. Mayer also maintains that Display had additional inherent value because the company's work-in-process, goodwill, and going-concern value were not shown on Display's balance sheet. As to work-in-process, Mayer has failed to establish that there was in fact any valuable work in process at the time of the sale. Although Display, in its tax returns for 1968 and 1970 through 1972, did use cost basis inventories to compute its gross profit from operations, it is impossible to determine from the returns whether Display had any work in process which was not reflected on the June 30, 1968, balance sheet. Mayer's assertions that Display had unrecorded goodwill and an inherent value as a going concern, in our view, are more relevant factors than the alleged tangible net asset *448 value which, as discussed above, appears to have been insignificant. Goodwill has been defined as "nothing more than the probability that the old customers will resort to the old place." Cruttwell v. Lye, 17 Vesey 335, quoted in Horton v. Commissioner, 13 T.C. 143, 148 (1949); and Schmitz v. Commissioner, 51 T.C. 306 (1968), affd. 457 F.2d 1022 (9th Cir. 1972). Mayer has not established that its old customers would continue to commission Display to do their display work. None of the customers were bound by long-term contracts which would require them to give Display any amount of business. Rather, the customers would solicit designs from various companies in the industry with none of the companies being guaranteed an order. In addition, Display relied very heavily upon one customer, Pan Am, for its business. Pan Am's business accounted for 70 percent of Display's sales in 1967 and 77 percent for the first 6 months of 1968. Display received much of this business from Pan Am because of the personal relationship which existed between Mayer and Emmer, then Pan Am's sales promotion manager. Obviously, since Emmer *449 after June 1968 was with Display, it was not the corporation but rather Emmer's old ties with Pan Am which would tend to keep Pan Am coming to Display. Moreover, it is clear that Display was essentially a personal service company and, as such (in addition to the Pan Am--Emmer connection), its business was dependent primarily upon the services and client relationships of Mayer. Mayer's importance to the success of the business "further disproves the existence of transferable goodwill attributable to the business itself." Wilmot Fleming Engineering Co. v. Commissioner, 65 T.C. 847, 861 (1976). There is no evidence that Display had the kind of earning capacity in excess of a normal return on its tangible assets which is ordinarily associated with recognizable goodwill. See Carty v. Commissioner, 38 T.C. 46, 58 (1962). Mayer also contends that Display had a "going concern value" in addition to the alleged value of its tangible assets and goodwill. The concept of "going concern value" has been enunciated in numerous cases. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 313 (1933); United States v. Cornish, 348 F.2d 175, 184-185 (9th Cir. 1965); *450 United States Industrial Alcohol Co. v. Helvering, 137 F.2d 511, 513 (2d Cir. 1943), affg. in part and revg. in part 42 B.T.A. 1323 (1940); VGS Corp. v. Commissioner, 68 T.C. 563, 591-592 (1977). To the extent that this "going concern value" can be distinguished from the almost equally intangible goodwill, it might be described as "the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership." VGS Corp. v. Commissioner, supra at 592; Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 235 (1975). Such a concept seems inherently inapplicable in a personal service business, such as Display's, having no significant tangible assets and substantially dependent upon the services and business connections of the selling owner. Display's ability to continue to function and to generate income without interruption, absent a continuing affiliation with Mayer, is seriously doubtful. This is evidenced by Emmer's unwillingness to join Display without some assurance from Mayer of his continued involvement. Simply stated, we are not *451 convinced that Emmer or anyone else would have paid more than the stated nominal consideration of $25 for Display's stock, absent the continued involvement of Mayer--or at least the agreement of Mayer not to compete. In addition to attacking the consideration for Display's stock as totally unrelated to its alleged inherent value, Mayer has also attempted to demonstrate that the stated compensation in the Employment Agreement was unrelated to the value of future services actually contemplated by the parties, and thus, in substance, represented disguised payments for his Display stock. Mayer argues that in fact, after the 1970 dispute with Emmer, he performed no services whatsoever for Display. He also refers to the provision in the Employment Agreement that the annual payments would continue even after his death, arguing that such a provision is inconsistent with the recitation that the payments are for services rendered. Although Mayer has adequately established that the $25,000 annual payments provided in the Employment Agreement were not in fact intended as compensation for past services, we do not think he has shown that these payments were not in fact intended as compensation *452 for current and future services. When Emmer began work with Display, he had had no experience in managing a company. He had to rely on Mayer's knowledge of how to run a business in general and Display in particular. It is reasonable that Emmer considered it essential to his success in the business to have Mayer available for consultation purposes. Mayer's experience and personal contacts with existing customers and subcontractors also were regarded as vital. This is true even though, because of the deterioration of the personal relationship between Emmer and Mayer, Emmer never asked Mayer for assistance. The nature of the payments depends upon the contract when entered into, not upon subsequent action or inaction by the parties. Barrett v. Commissioner, 58 T.C. 284, 289 (1972); Wager v. Commissioner, 52 T.C. 416, 419 (1969). The fact that the Employment Agreement provided that payments were to continue for the entire 10-year period even if Mayer should die during this period, is obviously a factor to be considered, but it does not necessarily mean that the agreed payments were not compensation for current and future services. Cf. O'Dell & Co. v. Commissioner, 61 T.C. 461, 470 (1974); *453 Wager v. Commissioner, supra; Levinson v. Commissioner, 45 T.C. 380, 391 (1966). We think Emmer regarded Mayer's services at the beginning so important that he was willing to commit Display to make payments for 10 years even if Mayer was not available to render services during the entire period. Moreover, the Employment Agreement contained a convenant by Mayer not to compete with Display's business. While this provision did not have a separately stated consideration, it represented an additional commitment on Mayer's part, supplemental to the consulting commitment, and it added value to the consideration for which Display was committed in the Employment Agreement to pay $25,000 annually. Emmer knew that Mayer's involvement with a competitor would have seriously damaged Display's business, and Emmer was willing to commit Display to pay such a substantial sum, in part, for the convenant not to compete. In summary, we hold that Mayer realized ordinary income from Display's payments to him of $12,500, $25,000, $25,000, and $25,000 for the years 1970 through 1973, respectively, and Display is entitled to business expense deductions under section *454 162(a)(1) of $12,500, $25,000, and $25,000 for the years 1970 through 1972, respectively. In view of our holding that the payments by Display to Mayer represented a deductible business expense to Display, and not payments with respect to Emmer's purchase of the Display stock, we reject respondent's alternative contention that such payments amounted to constructive dividends to Emmer and Emmer's alternative contention that he is entitled to an imputed interest deduction under section 483 with respect to the purchase of the Display stock. 2. 1970 Unreported Income of Mayer
Respondent determined that Mayer received $48,800 in ordinary income in 1970. In addition to the $12,500 reported by Mayer as capital gain from the sale of his Display stock, which respondent argued and we have herein determined should have been reported as ordinary income, respondent asserts that the Form W-2 which was attached to Mayer's original 1970 tax return correctly reflects wages of $36,300 paid, actual and constructive, to Mayer in 1970. Respondent contends that in addition to the actual wages of $12,500 paid Mayer for full-time services rendered Display as its vice president for the first 6 *455 months of 1970, Mayer indirectly received $23,800 in the form of an offset against amounts he owed Display. The issue is essentially a factual one. There was very little admissible, much less conclusive, evidence presented at trial on this issue. Moreover, the evidence which is available is inconsistent. Unfortunately, Display's books and records, the most probative evidence as to amounts paid or accrued by Display to or for the benefit of Mayer, were not available.
On November 12, 1970, Display and Mayer settled their lawsuit. Respondent's assertion that Mayer received, indirectly, an accrued bonus or wages of $23,800 arises from a claimed offset to the amounts allegedly owed Display.Although Display had asserted in its suit that Mayer owed it $46,700, this amount was disputed by Mayer. The settlement agreement does not acknowledge any total amount to have been due from Mayer, nor any agreed offset to that amount. The only evidence offered which shows what Display considered the offset due Mayer were the Form W-2 attached to Mayer's return and the minutes of the combined shareholders and directors meeting.Since Emmer was Display's sole stockholder at the time, these minutes *456 and the Form W-2 can only be regarded as reflecting Emmer's self-serving characterizations. We note that in both his original return and his amended return for 1970 Mayer apparently ignored the amount of wages reported in the Form W-2. Moreover, the Form W-2 was inconsistent with Display's 1970 corporate income tax return, which reflects, in Schedule E, compensation paid to Mayer of only $12,500. (The return also reflects, in its schedule of other deductions, consulting fees of $12,500, presumably paid to Mayer.) No other deduction is clearly identified as having been paid to or for the personal benefit of Mayer. Although Emmer, also a corporate officer during 1969 and 1970, received a bonus, there is nothing in the record to indicate that the corporation authorized a bonus for Mayer in either year.Under the circumstances we consider it highly unlikely that Emmer would have voluntarily consented to a bonus of $23,800 to Mayer in light of the fact that Mayer's rights were expressly fixed at $25,000 per year as part of the 1968 sale negotiations. In light of the above and since "[the] law imposes much less of a burden upon a taxpayer who is called upon to prove a negative--that *457 he did not receive the income which the Commissioner claims--than it imposes upon a taxpayer who is attempting to sustain a deduction," Weir v. Commissioner, 283 F.2d 675, 679 (6th Cir. 1960), revg. and remg. a Memorandum Opinion of this Court, we think that Mayer has submitted sufficient competent and relevant evidence to sustain his claim that he did not indirectly receive bonus compensation of $23,800 in 1970. Cf. Foster v. Commissioner, 391 F.2d 727, 735 (4th Cir. 1968), affg. in part and revg. and remg. in part a Memorandum Opinion of this Court; Herbert v. Commissioner, 377 F.2d 65, 69 (9th Cir. 1966), revg. a Memorandum Opinion of this Court; Taylor v. Commissioner, 70 F.2d 619, 621 (2d Cir. 1934), affd. 293 U.S. 507 (1935); Mysse v. Commissioner, 57 T.C. 680, 694 (1972). Accordingly, we have found as an ultimate fact that the total income received by Mayer from Display in 1970 was $25,000. 3. Pension Plan Deduction
Respondent disallowed Display's claimed deduction in its 1970 income tax return for its contribution of $7,114 to its pension plan which was established *458 that year. The controversy centers upon respondent's determination that Display's pension plan did not qualify for exemption under sections 501(a) and 401(a). If employer contributions are paid into a pension trust during a taxable year which ends within or with a taxable year of the trust during which the trust is exempt under section 501(a), the employer is allowed deductions under section 404(a)(1), with certain limitations and restrictions not here pertinent. In general, a trust is exempt under section 501(a) if it meets the qualification requirements of section 401. For the taxable year 1970, section 401(a) provided in pertinent part as follows: [5]
(a) Requirements for Qualification.--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section-- * * *
(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either-- *459 (A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or (B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees; and (4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees. *460 Respondent has determined that the $7,114 pension plan payment claimed by Display on its 1970 Federal income tax return is nondeductible because the plan does not qualify under section 401. Disqualification is based upon the fact that coverage under the plan is limited to those aged 25 and with 2 years service with Display. Thus, respondent contends, coverage is not based on a nondiscriminatory classification within section 401(a)(3)(B), since the plan in actual operation covers only "persons whose principal duties consist in supervising the work of other employees, [and/] or highly compensated employees." Respondent also argues that contributions to the plan discriminated in favor of highly compensated employees, as proscribed by section 401(a)(4). Respondent, however, concedes that even if Display's plan fails to satisfy the requirements of section 401(a)(3)(B) and (a)(4), Display will be able to deduct under section 404(a)(5) its contributions to the plan to the extent that these payments are includible in the employee's gross income pursuant to section 402(b). [6]
*461 We agree with Display's contention that the plan as established and operated did not discriminate in favor of the section 401(a)(3)(B) [7] and (a)(4) proscribed groups. Under section 401(a)(3)(B) and (a)(4), all the facts and circumstances are to be taken into account in determining whether a plan by its terms or in its operation is discriminatory. Greenwald v. Commissioner, 366 F.2d 538, 540 (2d Cir. 1966), affg. on this issue 44 T.C. 137 (1965); Quality Brands, Inc. v. Commissioner, 67 T.C. 167, 174-175 (1976); Loevsky v. Commissioner, 55 T.C. 1144, 1149 (1971), affd. 471 F.2d 1178 (3d Cir. 1973), cert. denied 412 U.S. 919 (1973); sec. 1.401-1(b)(3), Income Tax Regs. When Display adopted its pension plan on November 1, 1970, Emmer knew that Aronheim was pregnant and, *462 because of her pregnancy, would soon terminate her employment. In effect, she had already submitted her resignation. She in fact did leave within a couple of months. Coverage for her had she been included in the plan would have cost only about $200. In such circumstances, Display could hardly be expected to shape its pension plan in such a way as to provide her with pension rights. In the light of those unique facts, we think it was unreasonable for respondent to conclude that the plan was discriminatory in favor of the prohibited group either in its classification or in the contributions or benefits it provided. Cf. Loevsky v. Commissioner, supra; Babst Services, Inc. v. Commissioner, 67 T.C. 131, 140 (1976); Ed & Jim Fleitz, Inc. v. Commissioner, 50 T.C. 384, 390 (1968). To reflect the foregoing conclusions and the concessions made by the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: 535 Display Company, Inc., Formerly Display Designers and Producers, Inc., docket No. 6638-75; George Mayer & Phyllis Mayer, docket Nos. 6770-75 and 4162-76.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. Upon its liquidation, Dynamic also sold a small amount of photographic equipment to Display.↩
4. Although what constitutes "strong proof" has not been defined by the courts, the test's requirements are somewhat less than required by the Third Circuit in the so-called "Danielson test" under which a party can challenge the allocation "only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remg. 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967). Although the difference between the "strong proof" test and the "unenforceability" test may not be great, in deciding this case we will be guided by the "strong proof" test as adopted in Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957), by the Second Circuit--the circuit to which this decision is appealable. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971).
5. Sec. 401(a) was substantially amended in 1974 by P.L. 93-406. Such amendment has no bearing upon the outcome of the instant case, involving the year 1970.↩
6. In general, sec. 402(b) provides that contributions to a nonqualified trust by an employer constitute income to the employee-beneficiary. Sec. 404(a)(5) provides, generally, that contributions to a nonqualified plan are deductible by the employer "in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan."↩
7. Display has not attempted to rely upon the safe harbor percentage tests contained in subparagraph (A) of sec. 401(a)(3). Indeed, since it is clear that only two of Display's three employees in 1970 qualified under the plan, neither the 70-percent test nor the 80-percent test of that subparagraph were met.↩