IMPORT SPECIALTIES, INC. (NOW KNOWN AS IMPORT LIMITED), ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Import Specialties, Inc. v. Commissioner
Docket Nos. 12890-78, 12971-78, 12972-78, 12973-78
United States Tax Court
T.C. Memo 1982-41; 1982 Tax Ct. Memo LEXIS 708; 43 T.C.M. (CCH) 411; T.C.M. (RIA) 82041; January 29, 1982. *708 In 1971, Old Import, a corporation engaged in the wholesale costume jewelry business, sold its assets to Import Specialties. At the same time, two key employees of Old Import entered into employment contracts and covenants not to compete with Import Specialties. Held, the payments made by Import Specialties to the two employees did not constitute disguised payments for the goodwill of Old Import and therefore are deductible as compensation and as the amortized cost of covenants not to compete. Held further, Import Specialties improperly reduced its inventories under the lower of cost or market method for the years in issue. *709 Gerald J. Kahn, for the petitioners. Rogelio A. Villagliu, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In these consolidated cases respondent has determined deficiencies in petitioners' Federal income taxes as follows: Taxable Year
Docket No.
Petitioner
Ended
Deficiency
12890-78
Import Specialties, Inc.
Dec. 31, 1971
$ 24,962.00
Dec. 31, 1972
29,324.81
Apr. 30, 1973
20,287.82
Apr. 30, 1974
15,893.18
12971-78
Estate of Nat Eppstein,
Dec. 31, 1971
61,111.54
Deceased, by Dudley J.
Godfrey, Co-Personal
Representative
12972-78
Estate of Rose B.
Dec. 31, 1971
24,835.40
Weisbord, Deceased, by
Mary Anne Saltzstein,
Personal Representative
12973-78
Mary Anne Saltzstein [2]
Dec. 31, 1971
61,111.54
*710 The issues for decision are (1) whether payments made by petitioner Import Specialities, Inc., the buyer, to Nat H. Eppstein and Rose Weisbord, shareholders and employees of E.W., Inc., the seller, pursuant to employment contracts and covenants not to compete, are deductible by petitioner as compensation and as the amortized cost of covenants not to compete or whether such payments constitute part of the purchase price for the assets of E.W., Inc.; and (2) whether petitioner Import Specialties, Inc. properly determined the value of its inventory under the lower of cost or market method of inventory valuation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Import Specialties, Inc. (hereinafter sometimes referred to as Import Specialties) is a corporation organized under the laws of the State of Wisconsin with its principal office located in Milwaukee, *711 Wisconsin at the time of filing the petition herein. It timely filed its Federal corporate income tax returns for the taxable years ended December 31, 1971, December 31, 1972, April 30, 1973 and April 30, 1974 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioner Dudley J. Godfrey, Co-Personal Representative of the Estate of Nat Eppstein, was a resident of Milwaukee, Wisconsin at the time of filing the petition herein. Petitioner Mary Anne Saltzstein, Personal Representative of the Estate of Rose B. Weisbord, and also a petitioner herein in her individual capacity was a resident of Milwaukee, Wisconsin at the time of filing the petition herein. E.W., Inc. (hereinafter Old Import) was a Wisconsin corporation that had been engaged in the wholesale costume jewelry business for many years prior to April 1, 1971. [3]The corporation purchased its jewelry from East Coast manufacturers, held it at its principal office in Milwaukee, and resold the jewelry to retailers in the Midwest. Old *712 Import was owned largely by its employees. Nat H. Eppstein, general sales manager and president of the corporation, owned 63 percent of the stock of Old Import. The entire stock ownership as of March 31, 1971 was as follows: Percentage
Shareholder
Ownership
Nat H. Eppstein
63%
Rose B. Weisbord
4%
Mary Anne Saltzstein
10%
Karl Roeming
6%
William Lohmiller
2%
Robert Lohmiller
4%
Edward Lohmiller
10%
Henry Bross
1%
Mrs. Weisbord was administrative head of the office.Mr. Roeming, the three Messrs. Lohmiller and Mr. Bross were all salesmen employed by Old Import. Issue No. 1: Purchase and Sale of Business
In 1970 Mr. Norman Hyman was an insurance advisor to Old Import and to Mr. Eppstein. In September or October of that year Mr. Hyman paid a visit to new offices of Old Import and was favorably impressed. His inspection of the premises aroused a longstanding ambition to run a business of his own. Mr. Hyman was somewhat familiar with the business of Old Import. He knew that Mr. Eppstein, the majority stockholder and prime mover in the business, was well into his seventies and therefore might be receptive to an offer to purchase the company. *713 Although Mr. Hyman had no previous experience in the costume jewelry business, he considered himself an able salesman capable of learning, with the help of Mr. Eppstein, how to manage the business. Approximately 6 weeks after his initial visit to Old Import, Mr. Hyman disclosed to Mr. Eppstein his interest in purchasing the business. He advised Eppstein that he could get a better price for his business if he sold it while he was still alive. At that time, Mr. Eppstein appeared in good health. He was active in the business on a daily basis, working full time, directing the sales force, purchasing merchandise and overseeing finances. Eppstein told Mr. Hyman that he would consider the prospect of a sale to Hyman. Mr. Eppstein consulted his attorney, Mr. Dudley J. Godfrey, Jr., who was experienced in tax matters. Mr. Godfrey also previously had advised Eppstein to sell his business during his lifetime in order to secure a better price. After discussing the matter with Godfrey, Eppstein decided to accept Hyman's offer and sell the business. Mr. Eppstein thereafter informed Mr. Hyman of his willingness to sell. Unlike the customary practice, where the attorney for the buyer *714 prepares the sales agreement, Mr. Eppstein insisted that his own attorney draw up the agreement. Mr. Eppstein considered this a necessity since he wished to attach a number of conditions to the sale.These conditions in part evidenced a cencern for his own future and the future of the employees of Old Import. On the advice of Mr. Godfrey, it was determined that Old Import would sell its assets to Mr. Hyman rather than conduct a stock sale. Eppstein was able to require the inclusion of many of the terms and conditions of sale by virtue of his superior bargaining position. This circumstance was partially attributable to the fact that Mr. Hyman was dependent upon the financial assistance of Old Import to carry out the purchase and to operate successfully the business after the purchase. The terms and conditions included provisions for the continued employment of Mr. Eppstein and Mrs. Weisbord, the designation of Eppstein as president of the new business, the continuation of Old Import's pension and profit-sharing plans, the granting of an option enabling Mr. Eppstein's grandson, then in college, to acquire a substantial stock interest in the new business, the assumption by the new *715 business of Old Import's lease, and the granting of an option to certain key employees of Old Import to purchase up to an aggregate of one-third of the stock in the new business at book value.
Thereafter, Mr. Godfrey prepared and submitted to Mr. Hyman's attorney, David L. MacGregor, a number of agreements and documents in connection with the sale of assets of Old Import.These included the agreement of sale, employment agreements and a stockholders' agreement. The agreement set the purchase price of the Old Import assets at book value. There apparently was not a great deal of haggling over price; Hyman accepted the proposed amount. The employment agreement for Eppstein provided that he was to serve as president for a period of 3 years and as consultant-advisor for 5 years. The employment agreement was combined with a covenant not to compete and provided that Eppstein would be paid at the rate of $ 35,000 per year for the entire 8-year period. After negotiations with Mr. MacGregor, the employment agreement was revised to cover only 7 years, with Eppstein to serve for 2 years as president and for 5 years as consultant, and the yearly payments were reduced to $ 25,000 per year. *716 Eppstein had an income planning objective of spreading payments equally despite a change in employment status. In 1969 and 1970, prior to the sale, Eppstein had received a yearly salary of $ 52,500. The employment agreement for Mrs. Weisbord was similarly combined with a covenant not to compete and provided for the continuation of her employment as administrative head. She was to receive payments of $ 15,000 per year for a period of 7 years. In 1969 and 1970 Mrs. Weisbord had received a yearly salary of $ 27,500 per year. Mr. Hyman did not object to the employment agreements. He considered himself a "greenhorn" in the business and believed that it would be to his distinct advantage to assure the presence and assistance of the highly experienced Mr. Eppstein by this means.Hyman also believed that Eppstein's continued employment would help to retain the loyalty of the sales organization and of the suppliers of the business. Following the advice of his attorney, Hyman also insisted upon the inclusion of a covenant not to compete. The covenant was intended to prevent Eppstein from pirating away Old Import's sales force, which had worked for Eppstein for years, and from using *717 his experience and longstanding business relationships in competition with the new business. Because of the nature of the business he was entering, Mr. Hyman felt that the employment contract and covenant not to compete were essential. The wholesale costume jewelry business was highly competitive. The merchandise for sale did not vary from one wholesaler to another. Old Import, like its competitors, purchased costume jewelry from manufacturers located principally in Providence, Rhode Island and New York City, held the merchandise in Milwaukee, and sold it to retailers through its salesmen. No sales were made from a store location. Thus, the business's success turned on the existence of a constant flow of goods from supplier to retailer. Eppstein's longstanding relationship allowed him to secure sources of supply in times of shortage. This obviously enhanced the reliability of his sales force. The salesmen of Old Import were the company's sole contact with its market. The key salesmen had been employed by Old Import for many years and over that time had developed a great deal of trust with the retailers in their respective regions. Hyman's experience indicated that the bond *718 between salesman and retailer generally was stronger than that between wholesaler and retailer. Thus, when a salesman changed employers, he often took his accounts with him. The key salesmen of Old Import were extremely loyal to Mr. Eppstein and to Mrs. Weisbord. A 1957 buy-sell agreement indicated that even at that early date the three Lohmillers, Roeming and Bross had "been in the corporation's employ for many years." The same basic objectives inspired Mr. Hyman's willing acquiescence to the proposed employment contract for Mrs. Weisbord and his insistence on a corresponding covenant not to compete. Hyman was prompted by his perception that Weisbord played an integral part in the management of Old Import. He wished to gain the benefit of her experience, of the efficient manner in which she ran the office and of the close relationship she had with the sales organization. Moreover, the covenant provided added protection against the possibility Hyman would find himself competing against the key personnel of the corporation which he had just purchased. The sale of assets was to be made to petitioner corporation, organized by Hyman in early 1971. At that time, the name of the *719 corporation was New Import, Inc. In April 1971 the name was changed to Import Specialties, Inc. and subsequently was changed again to Import Limited (hereinafter Import Specialties). On March 13, 1971 a final agreement was entered into between representatives of Old Import and petitioner providing for the sale to petitioner of Old Import assets. Pursuant to the agreement, Old Import agreed to sell to petitioner only fixed assets, leasehold improvements, inventory, advances to salesmen, unexpired property and casualty insurance premiums, contracts and contract rights, trademarks, trade names, corporate name, goodwill and all rights and funds under the employment compensation laws of the State of Wisconsin as follows: Asset
Purchase Price
Fixed assets and leasehold
Seller's cost less reserves
improvements
for depreciation
Inventories
Seller's cost or the market
value thereof
Seller's accounts of draws
The net amount at which these
and advances to salesmen
are carried on the books of
seller
Unexpired property and
The pro-rata portion of the
casualty insurance of
premiums paid by the seller
seller
for such insurance relating
to the unexpired terms
thereof
Contracts and contract rights
$ 1 [4]
of seller, all right, title
and interest of seller to or
in trademarks, trade names,
corporate name, goodwill and
customer and supplier lists,
all rights and funds under the
unemployment insurance laws of
Wisconsin
*720 As partial payment in satisfaction of the total purchase price listed above, Import Specialties agreed to assume certain liabilities of Old Import. These included the accounts payable of Old Import, the accrued payroll and withholding taxes due and the accrued commissions owed to salesmen. Import Specialties also agreed to assume and perform all debts, obligations and liabilities of Old Import relating to or arising under contracts of Old Import made in the normal and ordinary course of business. The excess purchase price over the liabilities assumes was to be paid in cash. As a condition precedent to the sale, Import *721 Specialities was obligated to offer voting stock in an aggregate amount of 33-1/3 percent of its total equity interest to certain shareholders and employees of Old Import. The price for such stock was to be the same as the price paid by Hyman for the shares purchased by him but not in excess of $ 50,000 for the entire 33-1/3 percent. Another condition to the sale was the requirement that Import Specialties arrange a line of credit aggregating not less than $ 300,000 with interest at no more than 1 percent over the prime rate. The agreement of sale also provided that the seller would use its best efforts to insure the transfer of its customers to the buyer.It provided that Old Import was to make loans to Import Specialties, if so requested, in an amount not to exceed $ 250,000 in the aggregate at an interest rate of 1 percent per annum over the prime rate. Import Specialties also was obligated to collect Old Import's receivables and turn the proceeds over to old Import. The agreement of sale contained two other provisions which are relevant in this case. Provision 15 concerned the making of public announcements with respect to the sale. It provided as follows: No public *722 announcement of any kind to any individual, newspaper, radio station or other public medium shall be made prior to the consummation of the transactions between the parties contemplated under this Agreement. After said date, neither party shall make any announcement with respect to the transactions without the prior written consent of the other party, which consent shall not be unreasonably withheld. In no event shall any disclosure be made of the purchase price paid to Seller hereunder. Provision 16 of the sales agreement was a convenant not to compete which provided that the seller would not "either directly or indirectly, participate or engage in any business which competes in any way with the business being conducted by Seller as of the date hereof." Accompanying the sales agreement were the two employment agreements and covenants not to compete. The former covered terms of 7 years while the latter covered terms of 10 years. [5] Both Hyman and Eppstein were aware of the contemplated tax consequences of the agreements. As part of the *723 sale, Mr. Hyman was required to grant to Old Import an option to purchase stock of Import Specialties in an amount that would reduce Hyman's stock ownership to 51 percent. The purchase price was to be at book value. The option was to be exercisable for a period of 7 years. According to the agreement, the option was assignable to David Saltzstein, Eppstein's grandson. If Mr. Saltzstein chose to exercise his option to purchase the Import Specialties stock, then upon Mr. Hyman's death, Saltzstein would have an additional option to purchase at book value from Hyman's estate the number of shares that it would take for him to attain the same number of shares owned by the estate. This option would continue even after the expiration of the original 7-year period. If this option were exercised, then Hyman's estate was to have the right to offer all, but not less than all, of the shares held thereby at book value to Mr. Saltzstein. If the offer were turned down, then the shares would have to be surrendered for redemption by Import Specialties at book value. These provisions were incorporated into an Import Specialties stockholders' agreement of April 1, 1971. According to the stockholders' *724 agreement, the transfer of stock in Import Specialties was restricted in accordance with the terms of the agreement. The right of first refusal at a price not to exceed book value was granted the corporation and the remaining stockholders in the event of a contemplated lifetime sale of shares. On termination of the employment of any stockholder, the shares held thereby were required to be surrendered for book value. Article VI of the stockholders' agreement established the book value of the common stock of Import Specialties. It attributed no value to goodwill, going-concern value, trademarks, trade names, licenses, copyrights, patents or other intangible assets. The equipment, furniture, fixtures and other depreciable assets were to be valued at book value less the depreciation attributable thereto. The closing of the sale took place on April 1, 1971. On that date, Old Import assigned to Import Specialties, for collection purposes only, its trade accounts receivable totalling $ 552,635.76. The purchase price was determined from the amounts carried on the books of Old Import as follows: Assets Subject to Purchase
1. Fixed assets and leasehold
improvements -
$ 53,813.92
2. Inventories -
139,036.95
3. Salesmen's draws and advances
7,096.42
4. Unexpired property and casualty
insurance premiums
17,422.24
5.Prepaid show fees
742.60
Total
$ 218,112.13
*725 Liabilities Subject to Being Assumed
1. Accounts payable to be assumed
by buyer -
134,713.67
Net purchase price due seller
$ 83,398.46
No part of the purchase price was expressly attributable to goodwill or other intangibles. Neither were such assets reflected on the balance sheet of Old Import. During the sale negotiations, there were no discussions held with respect to the sale of goodwill or other intangibles. Import Specialties, after the purchase of the assets of Old Import, recorded on its books the assets purchased at the amount specified in the sales agreement. No value was ascribed to goodwill or other intangibles. The new corporation obtained the funds necessary to run the business through capital contributions and loans. Mr. Hyman invested $ 100,000 in the company and the other employee-shareholders collectively purchased $ 50,000 of Import Specialties stock pursuant to the sales agreement. Old Import loaned $ 250,000 to Import Specialties while First Wisconsin National Bank provided Import Specialties with a $ 300,000 line of credit. After the sale, Import Specialties was owned as follows: Norman Hyman
66.7%
Karl Roeming
8.0%
William Lohmiller
2.1%
Robert Lohmiller
5.1%
Edward Lohmiller
13.1%
Henry Bross
5.0%
*726 As stated, Roeming, the Lohmillers and Bross were key salesmen for Old Import. They purchased their stock from Import Specialties at book value pursuant to the stock option plan. The exercise of their options to purchase the stock of Import Specialties was financed by the nearly simultaneous redemption of their Old Import stock at book value. None of these individuals were bound by or received payments for a covenant not to compete.Old Import was liquidated on May 31, 1973. In accordance with the employment agreement entered into by the parties, Mr. Eppstein worked for Import Specialties full time from April 1, 1971 until sometime in late October or early November, at which time he suffered a heart attack which resulted in his death on November 21, 1971. During this approximate 8-month period, Mr. Eppstein devoted his energies to teaching Mr. Hyman the skills and knowledge necessary in the operation of the business. After Eppstein's death, Hyman became president of Import Specialties. Mrs. Weisbord also worked for Import Specialties after the sale of assets by Old Import. She was employed from April 1, 1971 until approximately July 29, 1975, when she died. During this *727 period, she performed the same functions on a full-time basis that she had performed for Old Import. These included administering the office, handling the internal organization of the business, and serving as secretary-treasurer of the corporation. Because of her experience in and knowledge of the business, her presence was especially helpful during the period immediately following Eppstein's death. At the time of the asset sale, both Eppstein and Weisbord were approximately 75 years old. Almost all of the other employees of Old Import continued as employees of Import Specialties. These included some 14 or 15 salesmen and 40 to 45 others. The retention of the salesmen allowed Import Specialties to retain virtually all of the business of Old Import. Though there was some expansion by Import Specialties, it carried on essentially the same business as Old Import. At the date of trial, the three Lohmillers and Henry Bross were no longer shareholders of Import Specialties, having either died or retired. Upon their termination with the company, their stock had been redeemed at book value. Another salesman, Mr. James Brackob, became a shareholder in 1974, paying book value for *728 his stock. From 1966 through 1970, the book net income of Old Import was: 1966
$ 40,042.53
1967
57,379.55
1968
64,750.52
1969
74,598.24
1970
76,348.97
From 1971 through 1974, the book net income of Import Specialties was: 1971
$ 29,644.45
1972
48,758.11
1973
67,036.91
1974
186,314.73
In his notice of deficiency to petitioner Import Specialties, dated August 28, 1978, respondent disallowed deductions taken by Import Specialties for the amounts paid to Eppstein and Weisbord for the taxable years 1971 through 1974 as follows: Taxable Year Ended
Dec. 31,
Dec. 31,
Apr. 30,
Apr. 30,
1971
1972
1973
1974
Compensation of
officers
$ 30,000.00
$ 15,000.00
$ 5,000,00
$ 15,000.00
Salaries and Wages
24,999.96
8,333.33
24,999.99
Total
$ 30,000.00
$ 39,999.96
$ 13,333.33
$ 39,999.99
It was determined that the above amounts actually constituted capital expenditures to acquire Old Import assets. A portion of the deferred capital expenditures was deemed by respondent to constitute interest. Accordingly, interest deductions were allowed to Import Specialties as follows: Taxable Year Ended
Amount
Dec. 31, 1971
$ 8,037.00
Dec. 31, 1972
10,715.99
Apr. 30, 1973
3,572.00
Apr. 30, 1974
10,715.99
*729 As stated, Old Import (hereinafter transferor) was dissolved on May 31, 1973. On or about that date, transferor, as part of its liquidating distribution, transferred to Mr. Eppstein, Mrs. Weisbord and Mary Anne Saltzstein assets having a fair market value in the amounts of $ 386,462.51, $ 24,459.65 and $ 61,149.13, respectively. On or about August 16, 1973, transferor made a second distribution to the three individuals of assets worth $ 5,938.53, $ 375.75 and $ 939.34, respectively. The transfers were made without any consideration by the recipients other than the surrender of their shares in the transferor. The transfers rendered the transferor insolvent and without assets with which to pay the $ 61,111.54 income tax deficiency determine by respondent for the taxable year ended December 31, 1971, plus interest. No part of such deficiency has been paid. Petitioner Dudley Godfrey, Mrs. Weisbord and petitioner Saltzstein each signed separate transferee liability agreements with respondent that provided as follows: In consideration of the Commissioner of Internal Revenue not issuing a statutory notice of deficiency to and making an assessment against the above-named transferor, *730 the undersigned, as transferee of assets received from the above-named transferor, assumes and agrees to pay the amounts of any and all Federal income or profits taxes finally determined or adjudged as due and payable by such transferor for the tax years ended December 31, 1971, to the extent of the liability at law or in equity as transferee within the meaning of section 6901 of the Internal Revenue Code and corresponding provisions of internal revenue laws. FURTHER: The undersigned agrees, in the absence of prior written consent of the Commissioner of Internal Revenue, not to sell, transfer, or assign without adequate consideration all or any substantial portion of its assets; * * *. Respondent has not issued a statutory notice to Old Import for the taxable year ended December 31, 1971, and has in every other respect duly performed all the terms and conditions of said agreements. By statutory notices of transferee liability dated August 28, 1978, respondent determined an income tax deficiency against transferor in the amount of $ 61,111.54. Notices were mailed to each of petitioners in docket Nos. 12971-78, 12972-78 and 12973-78. The parties have *731 stipulated that by reason of the transfer of assets and by reason of the transferee liability agreements, petitioners in docket Nos. 12971-78, 12972-78 and 12973-78 are each transferees at law and in equity within the meaning of section 6901 and, as such, are liable for the amount of the determined income tax deficiency found to be due to the respective extent of assets received in liquidation. Accordingly, petitioners in docket Nos. 12971-78 and 12973-78 are liable for up to the entire amount of the $ 61,111.54 deficiency found to be due, while petitioner in docket No. 12972-78 is liable for up to $ 24,835.40 of the $ 61,111.54 deficiency found to be due. Issue No. 2: Inventory Valuation
During the years in question, Import Specialties followed the lower of cost or market method of inventory valuation, the same method used by Old Import. Current merchandise and newly purchased merchandise allegedly were valued at cost. Merchandise which had been on hand for two selling seasons purportedly were valued at two-thirds of cost and merchandise that had been on hand for more than two selling seasons and samples allegedly were valued at one-half of cost. Mr. Hyman stated that *732 it was the practice in the jewelry industry for manufacturers to offer to wholesalers merchandise which the manufacturer still has on hand but is out of season or no longer in the manufacturer's product line at a discount of from one-half to two-thirds of regular price. Import Specialties' salemen sold their sample lines at the end of the selling season to their customers at one-half of the regular price. Import Specialties took a physical inventory at the end of each year. However, the company did not possess any specific inventory sheets detailing the different merchandise groups, the amounts of discounts of items on its selling lines or specific numbers or style numbers. Respondent asserted that Import Specialties had not adequately established that market prices of its inventory were less than cost for purposes of the lower of cost or market method used by the company. Therefore, closing inventories were adjusted as follows: Taxable Year Ended
Dec. 31,
Dec. 31,
Apr. 30,
Apr. 30,
1971
1972
1973
1974
Inventory as determined
$ 87,510.59
$ 303,983.38
$ 246,740.27
$ 294,984.93
Inventory per returns
57,469.43
242,132.84
152,384.77
196,802.61
Understatement of
Inventory
$ 30,041.16
61,850.54
94,355.50
98,182.32
Less: opening adjustment
30,041.16
61,850.54
94,355.50
Increase in cost of
goods sold
$ 30,041.16
$ 31,809.38
$ 32,504.96
$ 3,826.82
*733 OPINION Issue No. 1: Purchase and Sale of Business
The first issue for decision is whether payments made by petitioner corporation, the buyer, to Nat Eppstein and Rose Weisbord, shareholders and employees of the seller corporation, pursuant to employment contracts and covenants not to compete, are deductible by petitioner as compensation under section 162(a)(1) and as the amortized cost of covenants not to compete under section 167(a)(1) or whether such payments constitute part of the purchase price for the assets of the seller corporation. Respondent contends that the payments in substance were not made for the purposes designated by the parties but in actuality represented additional purchase price attributable to the goodwill of the seller corporation that allegedly was transferred along with the assets of that corporation. Petitioners, on the contrary, assert that the employment agreements and covenants not to compete were the bargained product of arm's-length negotiations and that the economic substance of the payments thereunder comport with their designated form. Amounts paid by a purchaser for goodwill yield capital gain to the seller with the purchaser acquiring *734 an intangible asset that may not be amortized. Throndson v. Commissioner, 457 F.2d 1022, 1024 (9th Cir. 1972), affg. Schmitz v. Commissioner, 51 T.C. 306, 313 (1968); section 1.167(a)-3, Income Tax Regs. On the other hand, payments by a corporation in compensation for services rendered thereto, including consulting fees, normally are deductible by the corporation and includable as ordinary income by the service provider. Ruge v. Commissioner, 26 T.C. 138, 143 (1956); section 162(a)(1); section 61. Similarly, amounts paid by a purchaser for a covenant not to compete result in ordinary income to the covenator, since they represent a substitute for ordinary income, and may be amortized by the covenantee over the covenant's useful life. Throndson v. Commissioner, supra at 1024; Ullman v. Commissioner, 264 F.2d 305, 307 (2d Cir. 1959); section 1.167(a)-3, Income Tax Regs. If we sustain respondent's position, the disputed payments must be added to the stated purchase price of Old Import's assets and the gain on the sale of those assets must be recomputed accordingly. [6] Consistent with this, deductions *735 taken by Import Specialties must be disallowed and instead treated as a capital expenditure for the purchase of goodwill. It is well settled that the courts are not bound by the form of a transaction when adjudging the tax consequences thereof. If the form of the transaction does not conform with reality, the courts may "pierce the form" and tax the substance. Griffiths v. Commissioner, 308 U.S. 355, 356 (1939); Higgins v. Smith, 308 U.S. 473, 476 (1940); Gregory v. Helvering, 293 U.S. 465, 469 (1935); Coca-Cola Company v. Commissioner, 369 F.2d 913, 918 (8th Cir. 1966). This concept is particularly applicable in cases such as ours. See O'Dell & Company v. Commissioner, 61 T.C. 461, 467 (1974). The burden of proving that the form of a transaction should be respected is upon the taxpayer. Rule 142(a), Tax Court Rules of Practice and Procedure.[7] *736 In this context, our duty is to ascertain the intentions of the participants at the time of the agreements and to determine if such agreements were consistent with those intentions and with the economic realities as then perceived by the participants. We are not called upon to restructure the transaction, with the benefit of hindsight, in a manner that more closely approximates the eventual outcome, for the nature of the controverted payments depends upon the agreements when entered into, not upon subsequent action or inaction by the parties. O'Dell & Company v. Commissioner, supra at 467; Barrett v. Commissioner, 58 T.C. 284, 289 (1972); Wager v. Commissioner, 52 T.C. 416 419 (1969). [8]
*737 The employment contracts and covenants not to compete were integrated into a single agreement between Eppstein and Import Specialties and a single agreement between Weisbord and Import Specialties.We will consider the employment contracts and covenants not to compete separately to determine whether the payments were for the purposes designated by the parties. Turning first to the employment contracts, these agreements provided that Eppstein was to be paid $ 25,000 a year for 7 years and that Weisbord was to be paid $ 15,000 a year for 7 years. At that time, both Eppstein and Weisbord were 75 years old. Eppstein was to continue as president of the new corporation for 2 years and then be available on a consulting basis for the final 5 years. In order to sustain respondent's position that all of the yearly payments made to Eppstein and Weisbord actually were part of the purchase price of Old Import assets, we must find that Eppstein and Weisbord did not intend to render valuable services to Import Specialties pursuant to the employment contracts. If they did plan to render such services, and expected to be compensated for them, then at least some of the payments under the *738 employment contracts were intended to be made in compensation for services. It was Eppstein, and not Hyman, who proposed the employment contracts. Hyman had approached Eppstein, then president and majority shareholder, with an offer to purchase the business at a time when Eppstein had given little thought to such a sale. Eppstein had been advised by both his lawyer and Hyman that it would be wise to sell his interest in Old Import while he was still alive. He followed their advice. The sale, however, did not suddenly extinguish Eppstein's desire to continue to work for a business for which he had worked for many years. Neither, we can speculate, did Eppstein wish to put the long-time employees of Old Import out of their jobs as a result of the sale. Therefore, he proposed employment contracts for himself and for Mrs. Weisbord, who over the years had served him faithfully and efficiently as administrative head of the internal office. He made sure that certain other key employees, who had been associated with Old Import for a number of years, did not forfeit their respective positions as shareholders and employees of the company. Although he did not insist upon employment *739 contracts for such salesmen, he certainly must have been aware that the success of Import Specialties was initially dependent on the continued employment of those salesmen by Mr. Hyman. This belief was borne out in fact, for all 5 of the key salesmen, who redeemed their stock interest in Old Import and used the proceeds therefrom to purchase the stock of Import Specialties at book value, continued to work for Import Specialties after the sale. The employment contracts were negotiated items. Under Eppstein's initial proposal, he was to continue as president for 3 years and as a consultant for the next 5 years and be compensated at a rate of $ 35,000 per year. The subsequent negotiations reduced the yearly payments to $ 25,000 and the term of employment to 7 years.
The contracts were not mere concessions made by Hyman to enable him to purchase the business. Though it naturally would be in his interest not to be overly generous in the terms of the contracts, there can be no denying that Eppstein's and, to a lesser extent, Weisbord's continued presence after the sale were essential to him. Hyman had no experience in the costume jewelry business. He had to rely upon Eppstein's *740 knowledge and experience during the period of transition and stood to benefit from Eppstein's close relationships with suppliers and with the employees of the business. We find it entirely believable that Hyman would have considered Eppstein's presence vital to the success of the business. See Yelencsics v. Commissioner,74 T.C. 1513, 1525 (1980). [9] The same is true with respect to Weisbord. She was highly conversant with the inner workings of the company and continued to be invaluable after the asset sale. The employment contracts *741 were negotiated at arm's length. Although Eppstein insisted upon the existence of the contracts, the evidence clearly establishes that Hyman and Eppstein bargained for the amount of compensation and terms of employment. We believe that the employment agreements were "the product of knowledgeable negotiations" and as such represent "a true meeting of the minds." O'Dell & Company v. Commissioner,61 T.C. 461, 468 (1974). Respondent argues that the payments were not intended as compensation. In support thereof, he declares that the fact that both Weisbord and Eppstein were 75 years old at the beginning of the 7-year terms, combined with the fact that the payments were to continue despite the death or disability of either party, establishes that an employment-type situation was not contemplated. The facts indicate otherwise. Prior to the sale, Eppstein was paid $ 52,500 per year for his services. This was reduced to $ 25,000 per year after the sale despite the fact that Eppstein was to continue to perform substantial services for at least 2 years. [10] Such payments do not seem unreasonable if it is believed that the parties intended Eppstein to perform services *742 for the business. Respondent contends that Eppstein never intended to render such services. This argument is belied by the fact that Eppstein rendered full-time services to Import Specialties for the 8 months after the sale until his death. [11] We refuse to infer from his death that Eppstein never intended to provide services over the entire 7-year term of the contract. While the elderly may not be as physically active as those of fewer years, the knowledge and experience accumulated over the lifetime of such persons often makes them especially valuable to successors. We are unwilling to declare, within reasonable limits, that elderly taxpayers are incapable of entering into arm's-length employment contracts that are based on an anticipated continuation of productive life. *743 We also believe that the employment contract between Weisbord and Import Specialties comports with its substance. Weisbord was working full time for Old Import at the time of the sale of assets and continued to work as such for Import Specialties after the sale. Prior to the sale, she had been earning $ 27,500 a year. Her salary was reduced to $ 15,000 a year under the employment contract. Under such contract, Weisbord worked approximately 4-1/2 years util death intervened. These subsequent services are further evidence of her intent to render services to Import Specialties for the term of the contract. We do not doubt that Hyman desired and benefited from those services. Weisbord's death after 4-1/2 years does not prove respondent's assertion to the contrary. The payments under the employment contracts were guaranteed to be made despite the death or disability of the service provider. While this provision might arouse suspicion, we believe that it is "immaterial in the context of the apparent arm's-length bargaining and attendant economic reality involved herein." Wager v. Commissioner,52 T.C. 416, 419 (1969). See also Yelencsics v. Commissioner, supra at 1525; *744 O'Dell & Company v. Commissioner,supra at 470; Levinson v. Commissioner,45 T.C. 380, 391 (1966). It is altogether plausible that Hyman considered Eppstein's and Weisbord's presence to be so vital that he was willing to guarantee payments for services that might never be performed. [12]
Respondent argues that absolutely none of the disputed payments were intended to be made in compensation for services rendered. Although both Eppstein and Weisbord rendered full-time services after the sale of assets up until their respective deaths, respondent did not attempt to make an allocation of the payments between the employment contracts, the covenants not to compete and the selling price. After a careful review of the evidence, we believe that the bulk, if not all, of the payments were intended to be made as compensation for services at the time the parties entered into the agreements. It follows that the value of the covenants not to compete was less substantial than the value of the *745 employment contracts. The evidence suggests that the covenants were inserted into the employment contracts at the request of Hyman.The fact that Eppstein went to such great lengths to assure his and Weisbord's continued employment by the new business indicates that he did not intend to commence another business in competition therewith. The unlikelihood of Eppstein's competing with Import Specialties is buttressed by the fact that Eppstein facilitated the shift of key employees from Old Import to Import Specialties during the sale of the business and by the fact that Import Specialties was indebted to Old Import in the amount of $ 250,000 after the sale. Hyman stated that Eppstein's insistence upon a provision for the granting of a stock option in favor of his grandson provoked his fear that Eppstein would set his grandson up in a business in competition with Import Specialties. The logic of this escapes us. If anything, Eppstein's requirement that a stock option be granted in favor of his grandson demonstrates that Eppstein had no intention of setting up another business. Rather, he had an additional reason for desiring the success of Import Specialties. Given this, we do *746 not think that the covenants not to compete had a large value relative to the employment contracts. However, this is not to say that they had no value or that they lacked economic substance. Although there was no separately stated consideration for the covenants, they did represent an additional commitment on Eppstein's and Weisbord's part, supplementary to their employment commitments, and they added value to the consideration for which Import Specialties was obligated to pay annually under the employment agreements. See Yelencsics v. Commissioner,supra at 1525. [13] Moreover, the fact that competition by Eppstein could have proven disastrous to Import Specialties supports a conclusion that the covenants had some value to Hyman even though their value was reduced by the unlikelihood of Eppstein's competing with Import Specialties. Thus, we believe that some portion of the payments was attributable to these covenants. However, in light of our holding, it is unnecessary for us to allocate the payments between the employment contracts and the covenants not to compete. *747 Respondent maintains that the payments to Eppstein and Weisbord were in reality attributable to goodwill of the business that was allegedly transferred from seller to purchaser. The facts demonstrate otherwise. Any goodwill of Old Import would be attributable to a competitive advantage resulting from customer loyalty to the business itself. Here, there was little or no such loyalty. The wholesale costume jewelry business was highly competitive. No advantage was gained from the particular merchandise of Old Import since there was nothing unique about it. During his years working as sales manager for Old Import, Eppstein had developed strong ties with suppliers, enabling him to secure inventories in times of shortage. These relationships were personal to Eppstein and, for the most part, did not come with the business but with the person. Similarly, customer loyalty was not to the business itself, but to the individual salesmen of the business.This is supported by the fact that, if a salesman left the business, his clients usually went with him. From the uncontested facts before us, it appears that the key salesmen of Old Import were loyal to Eppstein and not to the business. *748 For these reasons, we find it unlikely that any transferable goodwill existed. See Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 861 (1976). [14]
Neither Old Import nor Import Specialties reflected any goodwill value or value for any other intangibles on their books and records. See Wolcott v. Commissioner,39 T.C. 538, 544 (1962). The possible existence of goodwill was not overlooked by the parties, for in the asset sale, consideration of $ 1 was paid for the goodwill and other intangibles of Old Import. See Wilmot Fleming Engineering Co. v. Commissioner,supra at 860. Adding support to our conclusion that no goodwill was transferred between Old Import and Import Specialties is the fact that the stock of both could be obtained by specified parties by the exercise of options to purchase at book value and could be redeemed at book value. If Import Specialties had acquired a large amount of goodwill, as respondent asserts, one would think that the employee-shareholders would object to a provision that required the eventual redemption of their *749 shares at a price that did not reflect such goodwill. Moreover, one would think that if Hyman had just obligated himself to pay some $ 280,000 for goodwill (the combined payments due to Eppstein and Weisbord), he would resist the inclusion of a provision allowing Eppstein's grandson to purchase a large quantity of Hyman's stock at a book value that did not reflect such goodwill. We can discern no donative intent on the part of Hyman in purchasing the assets of Old Import. Finally, Hyman agreed that upon his death his estate would be required to sell his shares either to Eppstein's grandson or back to the corporation at book value. Again, since book value did not take goodwill into account, Hyman's assent to such a provision would result in an eventual forfeiture of the value of the alleged goodwill. Another fact that persuades us that the payments were not for goodwill or other intangible assets is the fact that the payments were made directly to Eppstein and Weisbord and not to Old Import as seller. Montesi v. Commissioner,40 T.C. 511, 520 (1963), affd. 340 F.2d 97 (6th Cir. 1965). Eppstein was to receive $ 175,000 total under the employment contract *750 and covenant not to compete. Weisbord was to receive a total of $ 105,000. The combined $ 280,000 was paid to shareholders holding a composite 67 percent of the stock. Were we to uphold respondent's contention, the inevitable implication would be that Eppstein defrauded the other 33 percent of the shareholders of Old Import by siphoning off their share of the value of the business's goodwill. We do not believe Eppstein perpetrated such a scheme. Eppstein and the employee-shareholders had worked side by side for a number of years at the time of the sale of the assets. Eppstein included provisions in the sales contract which assured the employee-stockholders continued ownership in the new corporation. Given this, it is almost inconceivable that Eppstein even would consider such a notion. Furthermore, if the payments had in fact been for goodwill, we think it highly unlikely that Eppstein would have diverted $ 105,000 of the payments to a 4-percent shareholder while receiving, as a 63-percent shareholder, $ 175,000. That is, not only did some 33 percent of Old Import shareholders fail to receive any of the alleged payments for goodwill, but also the two shareholders who did receive *751 such payments did not receive them in amounts proportionate to their ownership interests. In conclusion, we find that the employment agreements and covenant not to compete reflected the substance of the transactions under analysis. They were arm's-length agreements entered into after good faith negotiation between Eppstein and Hyman. The bulk of the payments were intended as compensation, although the covenants not to compete did have some value, especially in the case of Eppstein. However, none of the payments were disguised payments that were in reality in consideration for the transfer of goodwill. Issue No. 2: Inventory Valuation
Import Specialties valued its inventories using the lower of cost or market method. See section 1.471-2(c), Income Tax Regs.Section 1.471-4(a), Income Tax Regs., provides that "market" ordinarily "means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer." Section 1.471-4(c), Income Tax Regs., provides that [w]here the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at the *752 inventory date shall be compared with the cost of the article, and the lower of such value shall be taken as the inventory value of the article." Thus, under the lower of cost or market method, inventories cannot be valued below cost unless the cost-to-market comparisons are done on an article-by-article basis. Under section 471, the Commissioner has the authority to compel the taxpayer to value inventories in a manner that most clearly reflects the taxpayer's income. When the Commissioner determines, as he has here, that a taxpayer's inventory procedures are improper, it is incumbent upon the taxpayer to carry the heavy burden of proving that such determination is arbitrary and a clear abuse of statutory discretion. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 532-533 (1979); Lucas v. Structural Steel Co.,281 U.S. 264, 271 (1930); Rockwell International Corp. v. Commissioner, 77 T.C.     (1981); Brooks-Massey Dodge, Inc. v. Commissioner,60 T.C. 884, 894 (1973); All- Steel Eqipment, Inc. v. Commissioner,54 T.C. 1749, 1751 (1970), affd. on this point 467 F.2d 1184 (7th Cir. 1972). *753 Petitioner submitted evidence which showed that suppliers customarily offered discounts on merchandise that was out of season or otherwise obsolete, and petitioner contends that it reduced its inventory to reflect such offers. However, the company did not submit any specific inventory sheets detailing the different categories, the amounts of discounts of items on its selling lines, or specific numbers or style numbers. There has been no showing of a correlation between the specific items offered at discount by its suppliers and the corresponding items in petitioner's inventory whose values were reduced in consequence thereof. Here, petitioner simply has failed to carry its burden.Even were we to find that petitioner has proved that it received customary discounts from its suppliers and also has proved the precise discount prices so offered, thereby establishing a replacement market lower than cost, we would not be able to hold for petitioner. Petitioner also must show that, in reducing its inventory, it matched the market price of specific items offered at discount with the corresponding items in inventory. This it has failed utterly to do. We have before us no inventory sheets *754 and absolutely no other concrete evidence that the merchandise of petitioner was segregated into specific categories and properly reduced. [15] Petitioner may nor may not have properly reduced its inventory.It is up to petitioner to show us that the reductions were proper. Petitioner has not done so. Under these circumstances, we cannot find that respondent's determination was arbitrary and a clear abuse of discretion. Accordingly, we hold for respondent on this issue. To reflect the foregoing, Decision will be entered under Rule 155 in docket No. 12890-78.
Decisions will be entered for the petitioners in docket Nos. 12971-78, 12972-78 and 12973-78.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Nat Eppstein, deceased, by Dudley J. Godfrey, Co-Personal Representative, docket No. 12971-78; Estate of Rose B. Weisbord, deceased, by Mary Anne Saltzstein, Personal Representative, docket No. 12972-78; and Mary Anne Saltzstein, docket No. 12973-78.↩
2. Notices of deficiency were sent to petitioners in docket Nos. 12971-78, 12972-78 and 12973-78 as transferees of the assets of E.W., Inc., a liquidated corporation.↩
3. Until Apr. 1, 1971 E.W., Inc. had been known as Import Specialties Co., a company other than petitioner herein. Its name subsequently was changed to E.W., Inc.↩
4. In a buy-sell agreement entered into between Old Import and its stockholders on September 30, 1957, an option was given to the employee-stockholders to purchase Eppstein's shares upon his death or retirement. The option price of the shares of Old Import was to be computed on the basis of the book value of the net tangible assets of the corporation. Paragraph 6(a) of that agreement, as part of the definition of book value, provided as follows: "No allowance of any kind shall be made for good will, trade name, trade marks or any similar intangible asset."↩
5. The present value on Apr. 1, 1971 of the total payments to Eppstein and Weisbord under their employment agreements was $ 205,000.↩
6. Pursuant to stipulation of the parties, if we find for respondent, such additional gain would be attributed to petitioners Estate of Nat Eppstein, Estate of Rose B. Weisbord and Mary Ann Saltzstein, as transferees of the assets of Old Import.↩
7. This is not a case where the taxpayer is asserting that the substance of the agreement he entered is at variance with its form. In such case, where the taxpayer seeks to avoid the form of his own agreement, a higher level of proof often is required in order for him to carry his burden. Lucas v. Commissioner, 58 T.C. 1022, 1032↩ (1972).
8. See also Emmer v. Commissioner, T.C. Memo. 1978-102↩.
9. In Emmer v. Commissioner,T.C. Memo. 1978-102, the fact that the purchaser of the stock of a corporation had no prior experience in the corporation's business was found to be probative of the economic reality of an employment contract that retained the seller's availability for consultation purposes. This is to be compared with Mackey's Inc. v. Commissioner,T.C. Memo. 1975-280↩, where the purchasing party's thorough familiarity with the business was deemed to be indicative that payments made under the guise of consulting fees in actuality constituted part of the purchase price of the business.
10. The annual payments to Eppstein were spread equally over the 7-year term as a matter of tax planning. However, a rate of compensation of $ 52,500 per year for the first 2 years would not have been unreasonable considering the fact that Eppstein was to continue to perform substantial services during that period. Quite possibly, of the total $ 175,000 to be paid to Eppstein over the 7-year period, $ 105,000, or $ 52,500 per year for 2 years was attributable to services to be performed during the first 2 years, and $ 70,000, or $ 14,000 per year for 5 years, was attributable to consultation services to be performed over the last 5 years. ↩
11. This is to be distinguished from Nicholas Co. v. Commissioner,38 T.C. 348, 354↩ (1962), wherein the seller performed virtually no services after the sale. This fact was compounded by the fact that only nominal consideration was given for the tangible and intangible assets of the seller corporation. Our case is clearly distinguishable on both scores.
12. See Emmer v. Commissioner,T.C. Memo. 1978-102; Muskogee Radiological Group, Inc. v. Commissioner,T.C. Memo. 1978-490↩.
13. See also Emmer v. Commissioner,supra;Muskogee Radiological Group, Inc. v. Commissioner,supra.↩
14. See also Emmer v. Commissioner,supra.↩
15. Sec. 1.471-2(e), Income Tax Regs., provides that-- (e) Inventories should be recorded in a legible manner, properly computed and summarized, and should be preserved as a part of the accounting records of the taxpayer. The inventories of taxpayers on whatever basis taken will be subject to investigation by the district director, and the taxpayer must satisfy the district director of the correctness of the prices adopted.↩