ESTATE OF JULIAN MORRIS, DECEASED, JENNIE MORRIS, EXECUTRIX AND JENNIE MORRIS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Morris v. Commissioner
Docket Nos. 15582-79, 15583-79, 15584-79, 15585-79, 15586-79.
United States Tax Court
T.C. Memo 1983-467; 1983 Tax Ct. Memo LEXIS 324; 46 T.C.M. (CCH) 993; T.C.M. (RIA) 83467; August 10, 1983. Lawrence C. Zalcman, for the petitioners. Barry J. Laterman, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following income tax deficiencies in these consolidated cases: Docket
Name
Number
Year
Amount
Estate of Julian Morris,
15582-79
1975
$1,319
Deceased, Jennie Morris,
1976
1,590
Executrix, and Jennie Morris
1977
1,653
Myer Koslow and
15583-79
1975
1,179
Lillian W. Koslow
1976
1,456
1977
1,606
Morris Witten and
15584-79
1975
1,222
Lillian Witten
1976
1,431
1977
1,519
Max Witten and
15585-79
1975
1,293
Frances Witten
1976
1,657
1977
1,654
Louis J. Witten and
15586-79
1975
1,151
Lillian Witten
1976
1,407
1977
1,503
*325 The only issue for decision is whether payments made by the petitioners' Subchapter S corporation is Abraham Levey were for the acquisition of goodwill or were instead compensation for services and/or a covenant not to compete. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Julian Morris died on November 13, 1977. He and Jennie Morris were husband and wife, and they filed joint Federal income tax returns for 1975, 1976, and 1977 with the Andover, Massachusetts, Service Center. At the time the petition in docket No. 15582-79 was filed, Jennie Morris, individually and as executrix of her husband's estate, resided in Newton, Massachusetts. Each of the four petitioner-couples filed joint Federal income tax returns for 1975, 1976, and 1977 with the Andover, Massachusetts, Service Center. All of these petitioners resided in Massachusetts when they filed their petitions. Max Witten, Louis J. Witten, Morris Witten, Julian Morris, and Lillian Koslow were equal shareholders of a Massachusetts corporation, Causeway Print, Inc. (Causeway), which was located in Boston, Massachusetts, *326 and was engaged in the printing business. Abrham Levey was the sole shareholder and principal officer-employee of Peabody Master Printers, Inc. (Old Peabody), which was also a printing company located in Boston. In July 1962, as a result of a decline in his health, Levey caused Old Peabody to sell all of its machinery and physical assets and to discontinue its actual printing operations. He thereafter functioned solely as a salesman or broker in obtaining printing business. Levey worked out of an office at Causeway, and Causeway did all of the "production" work for his orders. This was done on a subcontracting basis, with Causeway billing Old Peabody and Old Peabody in turn billing the customer at some higher price. The record does not disclose whether the customers of Old Peabody were aware that the printing was actually performed by an entity other than Old Peabody itself. The foregoing arrangement continued until 1974, when Levey was close to or perhaps beyond 80 years of age. Some months earlier negotiations were entered into to change the subcontracting relationship with Causeway. In these negotiations, Causeway and its principal (its chief executive officer, Max *327 Witten) and Old Peabody and its principal (Levey) were all represented by attorneys and accountants. The result of these negotiations was an agreement of June 15, 1974, which is set forth here in relevant part: AGREEMENT
WHEREAS, PEABODY MASTER PRINTERS, INC. (hereinafter referred to as "Peabody") is a Massachusetts corporation having its principal place of business in Boston, Suffolk County; and WHEREA, ABRAHAM LEVEY (hereinafter referred to as "Levey") is the sole stockholder and principal officer and employee of said Peabody; and WHEREAS, MAX WITTEN is presently forming a Massachusetts corporation (hereinafter referred to as "Master"), which corporation will be desirous of obtaining from Peabody all of its customers, including a principal customer thereof, namely, New England Merchants National Bank of Boston, and the consulting services of said Levey. NOW. THEREFORE, in consideration of the foregoing and the covenants herein contained, it is agreed as follows: 1. Peabody hereby agrees to transfer to Master all of its accounts, including but not limited to the account known as the New England Merchants National Bank of Boston account. In this connection, Peabody *328 represents that these accounts are not the only assets of Peabody, and that this transaction is not subject to the bulk sales provisions of Massachusetts General Laws Chapter 106 but that other assets, such as fixtures, type, equipment, accounts receivables are not transferred and Peabody retains its corporate existence. 2. Master will engage Levey to serve as a consultant to Master for a period of three years and eleven weeks, upon the terms and conditions hereinafter set forth, commencing on June 15, 1974. 3. During the period set forth above, Levey agrees as an independent contractor to furnish services of an advisory or consulting nature with respect to the business and affairs of Master as his health may permit. However, it is understood that such services shall not require Levey to be active in the day-to-day activities of Master, and he shall not be an employee of Master, but shall only act in the capacity of an independent contractor. In this regard, Levey is free at all times to arrange the time and manner of performance of the consulting services. Master may, if it wishes, provide Levey with an office on Master's premises but Levey shall not be obliged to use such *329 office. The activities of Levey as a consultant and advisor shall include but shall not be limited to either assisting officers of Master in contract and purchasing negotiations or presenting specific recommendations with respect to the various operations of Master. 4. For the period described in Paragraph 2 above, Master shall pay to Levey a weekly compensation in the amount of Three Hundred ($300.00) Dollars; provided, however, that the total of all payments made to Levey during said period of this contract shall not exceed the sum of Fifty Thousand ($50,000.00) Dollars. When the total sum of Fifty Thousand ($50,000.00) Dollars has been paid to Levey, or his daughter as set forth below in Paragraph 5, this contract shall terminate unless otherwise mutually agreed to by the parties; and, Master shall then be the owner of all the accounts of Peabody which are the subject of this Agreement. 5. In the event of Levey's decrease prior to the termination date of this contract, the weekly payments on the said Fifty Thousand ($50,000.00) Dollars of Three Hundred ($300.00) Dollars shall be made by Master, or its nominee, to Levey's daughter, Frances Lavenberg, 221 Upland Avenue, *330 Newton Highlands, Massachusetts, her heirs or assigns. 6. Master, or its nominee, shall be responsible for the said weekly payments to Levey during the said three year and eleven week period of this contract only so long as Master, its nominee, subsidiaries, agents, employees, officers, stockholders, assignees, family members of any of the foregoing, or any affiliated company of said Master shall continue to retain the account with the New England Merchants National Bank of Boston. Upon termination of its work with the New England Merchants National Bank of Boston for whatever cause and by whichever party, Master shall have the right to cancel this Agreement with Levey and all further payments shall cease. 7. With the exception of Levey's performance of consulting services for Master as provided herein Levey and Peabody shall refrain, directly or indirectly, from carrying on a printing business during the said three year and eleven week period of this contract unless this agreement is cancelled by Master under the provisions of Paragraph 6 hereof. 8. Levey and Peabody agree not to reveal to outside sources without the consent of Master or its nominee any corporate matters *331 or confidential information concerning Peabody, the revealing of which would adversely affect Master's business. The first draft of this "Agreement" was prepared by a representative of Levey, and it provided that Levey be paid a consulting fee of $200 a week for five years. The form of this proposal, i.e., payments representing "consulting" fees, was based at least in part upon unspecified considerations in respect of "Social Security". Levey's representatives made no attempt to allocate any consideration to the acquisition of goodwill; instead, they wanted only a consulting contract for Levey. In addition, no consideration was given to allocating any portion of the payments to the covenant not to compete. The negotiations finally establishing the payment terms of $300 a week for three years and eleven weeks were conducted solely by Max Witten and Levey. In accordance with the Agreement, a new corporation, Peabody Master Printers Co., Inc. (referred to in the Agreement as Master and sometimes hereinafter as New Peabody), was formed as a Massachusetts corporation on or about May 16, 1974. Its outstanding stock was held equally by the five shareholders of Causeway. As stated *332 in the Agreement, Old Peabody's principal customer was New England Merchants National Bank of Boston (Merchants Bank). After June 15, 1974, the Merchants Bank account continued to be handled exclusively by Levey through New Peabody. Levey obtained the orders from Merchants Bank, made out the "job tickets" and gave them out in the "shop", and then watched the progress of the job throughout the printing process. If the customer required a "proof" for a particular job, Levey would show the proof to the customer, return to the shop and make any necessary corrections, and then show the customer another proof. Levey worked every day while he remained healthy, and he took sole responsibility for servicing his customers. Levey also billed these customers on behalf of New Peabody, which realized a profit on each job. Causeway earned a profit as well on the work done for New Peabody, though its profit was less than on work done for others. Levey became ill and ceased working every day some five or six months before the end of the three year, eleven week period specified in the Agreement. Nevertheless, New Peabody continued to make the payments required by the Agreement, and Levey received *333 the following amounts during the periods relevant herein: New Peabody's taxable
Amount paid
year ended March 31
Levey
1975
$12,600
1976
15,900
1977
15,600
$44,100
Levey reported these payments as ordinary income. The record does not disclose the precise amount paid Levey after March 31, 1977, although the Agreement required that he be paid $5,900 ($50,000-$44,100). Levey died on May 10, 1979. New Peabody's operating results for the years in issue were as follows: Gross
Payments
Net
Period
Sales
to Levey
Income
May 16, 1974 - March 31, 1975
$101,538
$12,600
$4,643
April 1, 1975 - March 31, 1976
135,820
15,900
10,461
April 1, 1976 - March 31, 1977
133,670
15,600
19,463
Merchants Bank accounted for at least 90 percent of New Peabody's sales. During these years, the "going rate" for printing salesmen in the Boston area was approximately 15 percent commission on sales. At the time of trial, New Peabody still had the Merchants Bank account, and the account was serviced through New Peabody rather than directly by Causeway. On its Federal income tax returns for its taxable years ending March 31, 1975, March 31, 1976, and *334 March 31, 1977, New Peabody, an electing small business corporation, claimed deductions for "Consultant Fees" or "Consulting Fees" for the payments to Levey. Accordingly, the amounts shown on the petitioners' 1975, 1976, and 1977 Federal income tax returns as their respective shares of the income which flowed through from New Peabody in those years reflect New Peabody's deduction of the payments to Levey. Pursuant to the Commissioner's determination that "it has not been established that such fees represent ordinary and necessary business expenses of the corporation within the meaning of section 162 of the Internal Revenue Code", a deficiency was determined for each year in respect of each taxpayer. OPINION Section 162(a)(1) allows a taxpayer to deduct as an expense of carrying on a trade or business "a reasonable allowance for salaries or other compensation for personal services actually rendered". On the other hand, no deduction is permitted for amounts paid to purchase goodwill, a capital asset which is nondepreciable because of its indeterminate useful life, *335 section 1.167(a)-3, Income Tax Regs. Thus, not surprisingly, the petitioners contend that the payments to Levey in New Peabody's taxable years ending in 1975, 1976, and 1977 were compensation for services and the covenant not to compete, while the Government takes the position that Levey was paid solely for the transfer of his major customer, Merchants Bank, and that this constitutes the purchase of goodwill. After a careful review of the Agreement, as well as the circumstances illuminating the intentions of the parties to the Agreement, we are persuaded that all of the payments were compensation for the services provided by Levey, and that no portion of the payments should be attributed to the purchase of goodwill. [2]
The result that we reach is not free from doubt, and the Government's position is hardly frivolous. Nevertheless, we think that the scales tip in petitioners' *336 favor. The Agreement itself refers to the desires of the new corporation not only to acquire all of Old Peabody's customers with pointed emphasis upon Merchants Bank, but also to obtain the "consulting" services [3] of Levey. In our judgment, based on the entire record, the payments were made for Levey's services, and the acquisition of Old Peabody's customers (particularly Merchants Bank) was regarded merely as following automatically from Levey's services. Levey's duties were in no sense the familiar "consulting" services which involve little or no real work. The evidence shows that he went to the plant daily, was the sole contact with New Peabody's customers, wrote up the "job tickets", gave them out in the shop, supervised the execution of the work by Causeway, consulted with the customer about changes in the proofs, and in short ran the operation of New Peabody in its entirety. On days when bad weather might otherwise *337 have prevented him from appearing at the plant he was urged by Max Witten to use a taxi. To be sure, the Agreement focused on both Levey's services and the customers' accounts. Thus, in paragraph 1, Old Peabody agreed to transfer all of its accounts to New Peabody, while in paragraph 2 it agreed to "engage Levey to serve as a consultant" for three years and eleven weeks. Paragraph 4 provides that "[f]or the period described in Paragraph 2" New Peabody would pay Levey a "weekly compensation" of $300, up to a maximum of $50,000, and then, returning to the other purpose of the Agreement, it provides that at the end of this period New Peabody would be the "owner" of all of Old Peabody's accounts subject to the Agreement. Under paragraph 5 the payments were to continue despite Levey's death, but under paragraph 6 New Peabody could cease making the payments at any time, before or after Levey's death, if New Peabody terminated or otherwise lost the Merchants Bank account. Admittedly, there is much in the Agreement, at least on a superficial reading, that would support the Government's position. Thus, it cannot be doubted that the goal of Max Witten in entering into this arrangement *338 was to secure the continuing business of Merchants Bank, which Causeway had enjoyed on a subcontracting basis for some 12 years, after Levey ceased working. On the other hand, it is equally clear that it was not the view of Levey and Max Witten that Levey could simply deliver this account to New Peabody or Causeway without further substantial personal services and expect that the account would be retained. The Merchants Bank account was not in any significant way tied to the corporate shell of Levey's business, Old Peabody, such that by selling Old Peabody Levey could effectively transfer the account. Instead, the account was apparently tethered to Levey himself, [4] and as a consequence his services were required to accomplish the transition from Old Peabody to New Peabody. Thus, although the goal of Max Witten was to sustain indefinitely the relationship by which Causeway received this printing business from the Merchants Bank, it does not appear that this intangible relationship could be purchased; instead, what he felt constrained to pay $50,000 for was the services of Levey which he viewed as necessary to achieving his objective. Surely, considering that Old Peabody had no *339 assets aside from the services of Levey, Max Witten could have approached the Merchants Bank and explained, if indeed any explanation was required, the circumstances under which the printing work had been done for the prior 12 years, and in this manner he might have been able to get the account without paying Levey anything. Nevertheless, in his judgment it was worth $50,000 to have Levey continue to service the account for this period while the transition was made. Moreover, during the three years in question, these payments to Levey averaged 11.93 percent of New Peabody's sales, which is substantially less than the 15 percent commission common in the printing business in Boston at that time. In Max Witten's testimony, which we found highly credible, he made clear that he relied entirely on Levey to service this account until Levey's health deteriorated, and that he encouraged Levey to come to work every day for this purpose. While the fact that Levey did provide services might not necessarily alter the result if we were otherwise convinced that Levey would have been able to somehow "sell" the account and that the $50,000 was paid to purchase it, such is not the case here. The *340 Agreement provided that Levey was to be compensated for his services; we have found that those services were necessary to accomplish the goal of the parties to the Agreement; Levey in fact provided the services; [5] the amount paid did not exceed the going rate for such services; and the payments were reported by Levey as ordinary income. In these circumstances, we are unwilling to accommodate the Government's attempt to deny New Peabody the tax treatment which is consistent with the form and substance of the transaction. We do find it somewhat troubling that the payments to Levey were to continue after his death (at which point they were to go to his daughter), for this might be thought to raise an inference that the payments were for something other than his services. Nevertheless, *341 it has been recognized that a payor may value services so highly as to be willing to commit to payment for a set period regardless of the payee's death or disability, and where (as here) the agreement results from arm's-length negotiations, such a provision may be "immaterial". Yelencsics v. Commissioner,74 T.C. 1513, 1525 (1980); Wager v. Commissioner,52 T.C. 416, 419 (1969); cf. O'Dell & Co. v. Commissioner,61 T.C. 461, 470 (1974). Similarly, the right of New Peabody to discontinue the payments if it or Merchants Bank terminated the account does not affect the conclusion reached herein. If the account were terminated, then the services would be of no value to New Peabody and it is not surprising that the payments (and presumably the services) would cease. The mere fact that the "consulting" agreement was contingent does not transform it into something else; any and all payments that New Peabody became obligated to make as events unfolded were compensation for services. Finally, we do not find compelling force to the Government's *342 contentions that the use of a new corporation with a name almost identical to Old Peabody and the fact that New Peabody entered into an agreement with Old Peabody rather than simply hiring Levey "points to the sale of goodwill". While it seems apparent that the name of the new corporation was intended to aid in a smooth transfer of the account, we think that this factor was merely incidental to, rather than at the heart of, the course chosen by Levey and Max Witten to ensure that the account would be retained. It simply does not appear that anyhthing about Old Peabody itself, which for some 12 years had been nothing more than a corporate shell, was of importance to Merchants Bank; to the contrary, the evidence is persuasive that the key to this account resided in the person of Levey. In respect of the second contention, we note that Levey was a party to the Agreement both individually and in his position as "President and Treasurer" of Old Peabody. However, we attach no special significance to the latter role in evaluating the nature of the payments provided for therein, particularly since the payments were made directly to Levey. Cf. Import Specialties, Inc. v. Commissioner,43 T.C.M. 411, 422, 51 *343 P-H Memo T.C. paragraph 82,041 (1982). We are satisfied on the record as a whole that the payments were entirely for Levey's services, and New Peabody is therefore entitled to treat the payments as such, just as was done by Levey. Decisions will be entered for the petitioners.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Myer Koslow and Lillian W. Koslow, docket No. 15583-79; Morris Witten and Lillian Witten, docket No. 15584-79; Max Witten and Frances Witten, docket No. 15585-79; and Louis J. Witten and Lillian Witten, docket No. 15586-79.↩
2. Although not strictly "services", the covenant not to compete may conveniently be coupled with "services" for purposes of this case, and, in view of our conclusion, we need not consider what part, of any, of the payments might technically have been allocable to the covenant.↩
3. We ignore the word "consulting", for we are satisfied by the record that what was meant was regular services and that the word "consulting" was added euphemistically to give color to whatever considerations were involved relating to "Social Security".↩
4. See Import Specialities, Inc. v. Commissioner,43 T.C.M. 411, 421, 51 P-H Memo T.C. paragraph 82,041 (1982); Emmer v. Commissioner,37 T.C.M. 460↩, 472, 47 P-H Memo T.C. paragraph 78,102 (1978). 5. In this respect, compare Yelencsics v. Commissioner,74 T.C. 1513, 1524 (1980), with Coven v. Commissioner,66 T.C. 295, 304↩ (1976).